UNITED STATES, Appellee

v.

Jorge L. RODRIGUEZ, Yeoman Third Class
U.S. Navy, Appellant

No. 97-0299

Crim. App. No. 9500776

United States Court of Appeals for the Armed Forces

Argued November 19, 2003

Decided August 25, 2004

BAKER, J., delivered the opinion of the Court, in which
CRAWFORD, C.J., GIERKE, and ERDMANN, JJ., joined.  EFFRON, J.,
filed a separate dissenting opinion.


Counsel

For Appellant: Lieutenant Elysia G. Ng, JAGC, USNR (argued).

For Appellee: Captain Glen R. Hines, JAGC, USMC (argued);
    Commander Robert P. Taishoff, JAGC, USN (on brief).

Amici curiae: Daniel M. Kummer, Esq. (argued); Eugene R. Fidell,
    Esq. (on brief) – for the National Broadcasting Corp., Inc.
    Jennifer Jaskel (law student)(argued); Patricio Asfura-Heim
    and Ryan Tierney (law students), and Kevin J. Barry, Esq.
    (supervising attorney)(on brief) – for the Catholic
    University of America, Columbus School of Law, Military and
    National Security Law Student Association.



Military Judge:  W. F. Grant


THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION.

United States v. Rodriguez, No. 97-0299/NA

Judge BAKER delivered the opinion of the Court.

In February 1994, Appellant was tried by a general court-martial composed of officer and enlisted members. Contrary to his pleas, he was convicted of attempted transfer of firearms, conspiracy, desertion, failure to obey a general regulation, unlawfully engaging in the business of dealing in firearms, unlawful transfer of firearms and the unlawful possession of firearms, in violation of Articles 80, 81, 85, 92 and 134, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 880, 881, 885, 992 and 934 (2000), respectively. The adjudged and approved sentence included a bad-conduct discharge, confinement for ten years, forfeiture of $200 pay per month for sixty months, and reduction to E-1. The Court of Criminal Appeals affirmed. United States v. Rodriguez, 44 M.J. 766 (N-M. Ct. Crim. App. 1996). This Court set aside that decision and remanded for a DuBay[1] hearing to develop facts related to a defense requested videotape of the events surrounding Appellant's arrest by federal agents. United States v. Rodriguez, 50 M.J. 38 (C.A.A.F. 1998)(summary disposition). After the findings and sentence were again affirmed by the lower court, United States v. Rodriguez, 57 M.J. 765 (N-M. Ct. Crim. App. 2002), we granted review of the following issue:

I

---

[1] United States v. DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967).

2

WHETHER THE MILITARY JUDGE ERRED IN DENYING
APPELLANT'S MOTION TO ORDER THE PRODUCTION
OF NBC'S RECORDINGS RELATING TO APPELLANT'S
TRAFFIC STOP AND SUBSEQUENT DETAINMENT,
SEARCH AND INTERROGATION.

We specified the following issues:

### II

WHETHER THERE WAS AN ILLEGAL SEIZURE OF
APPELLANT IN CONJUNCTION WITH THE STOP OF
APPELLANT'S CAR AND, IF THERE WAS AN ILLEGAL
SEIZURE, WHETHER APPELLANT'S ORAL AND
WRITTEN ADMISSION AND ANY SUBSEQUENTLY
SEIZED PHYSICAL EVIDENCE SHOULD HAVE BEEN
EXCLUDED.

### III

WHETHER SPECIAL AGENT GRABMAN OF THE BUREAU
OF ALCOHOL, TOBACCO, AND FIREARMS WAS
REQUIRED UNDER THE CIRCUMSTANCES TO ADVISE
APPELLANT OF HIS RIGHTS UNDER ARTICLE 31,
UNIFORM CODE OF MILITARY JUSTICE.

### IV

WHETHER THE ESTABLISHED ATTORNEY-CLIENT
RELATIONSHIP BETWEEN APPELLANT AND HIS
ORIGINAL DUBAY DEFENSE COUNSEL WAS
IMPROPERLY SEVERED IN THE MIDST OF THE DUBAY
PROCEEDINGS, IN TERMS OF WHETHER APPELLANT
KNOWINGLY CONSENTED TO THE CHANGE OR THERE
WAS OTHERWISE AN APPROPRIATE REASON FOR
SEVERANCE ABSENT APPELLANT'S CONSENT.

### V

WHETHER APPELLANT WAS PROVIDED A TIMELY
APPELLATE REVIEW UNDER THE UNIFORM CODE OF
MILITARY JUSTICE AND THE UNITED STATES
CONSTITUTION.

United States v. Rodriguez, No. 97-0299/NA

For the reasons that follow we affirm.[2]

FACTS

The Court of Criminal Appeals summarized the facts in its first opinion in this case as follows:

> In the spring of 1991 Special Agent [SA] Grabman of the Bureau of Alcohol, Tobacco, and Firearms [ATF] received reports that appellant had purchased more than one firearm in a 5-day period at gun stores in Northern Virginia. Although there is no legal limit on the number of firearms one may purchase in Virginia, appellant's pattern of purchases caused SA Grabman to open an investigation. Further inquiry revealed that appellant had purchased some 24 inexpensive handguns, commonly called "Saturday Night Specials," during February and March of 1991, and that he had no license to sell firearms. ATF determined that appellant was on active duty in the Navy, and notified the Naval Investigative Service [NIS] to obtain their cooperation in the case.[3]
>
> Beginning on Monday, 29 April 1991, ATF and NIS worked together in a surveillance of appellant at his home in Northern Virginia and at his place of work, the Bureau of Naval Personnel in Arlington. The close surveillance revealed that appellant and YN1 Moore were making multiple purchases of handguns from local gun dealers. It appeared to the agents that Moore had made "straw purchases" for appellant so that appellant's name would not appear on the gun purchase applications. Over the next several days the agents observed appellant and Moore buy 19 such handguns.
>
> Appellant's wife and children lived in New York City. He would often drive from Virginia to New York to visit them. On Friday, 3 May 1991, an informant

[2] We heard oral argument in this case at the Catholic University of America, Columbus School of Law, Washington, D.C., as part of the Court's "Project Outreach." See United States v. Mahoney, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003).

[3] In 1992, the name of this agency was formally changed to the Naval Criminal Investigative Service.

4

advised the ATF and NIS that appellant planned to drive to New York City that weekend. The informant made no mention that appellant was going to transport any weapons. Later that afternoon the investigators followed appellant as he left work at 1530 and drove home. There he retrieved a large duffle bag which he transported back to the Navy Annex. Leaving the duffle bag there, he drove to Fort Myer where he picked up two passengers. Appellant then drove to an apartment where his daughter's aunt, Mrs. Barbara Soto, lived. He carried a rather heavy brown paper bag into the residence but left without the bag. Returning to the car with Mrs. Soto, the group of four drove north on I-95.

Although SA Grabman believed he had enough evidence of illegal activity to stop and arrest appellant at that time, he wanted to continue the investigation to try to identify the other members of what he believed to be an interstate weapons transportation network. ATF and NIS agents continued their surveillance of appellant's car in unmarked law-enforcement vehicles. Riding in an ATF vehicle was an NBC camera crew that ATF had contacted to film what the agents and crew believed would be a newsworthy event. Also present were some senior ATF officials and an ATF public affairs officer.

A Maryland State trooper stopped one of the unmarked ATF cars for speeding. After advising the Maryland police authorities that they were surveilling a suspect as part of a Federal investigation, senior ATF personnel decided to enlist their cooperation in pulling appellant over. After seeing appellant's car pass his position, Trooper Pearce followed him for about a minute, noticed him tailgating a car in the fast lane, and pulled him over to the central median for "following too closely," a common traffic infraction. After examining appellant's license and registration and running a computer check, Trooper Pearce issued appellant a warning citation at 1946. He then requested that appellant consent to a "routine search" of his car for contraband. Appellant did so consent, in writing, at 1950. Over the next 1-1/2 hours or so, Trooper Pearce, assisted by ten or so ATF agents, conducted a thorough search of appellant's car

5

in the expectation of finding one or more handguns.

Shortly after the search commenced, SA Grabman took appellant aside and, using a card he carried in his wallet, advised him of his Miranda rights. After appellant acknowledged his rights, SA Grabman questioned him about his purchases of handguns over the preceding few months. Appellant initially denied any wrongdoing. SA Grabman then reviewed the details of his case file with appellant and the extent of the Government's recent surveillance activities. After hearing these specifics, appellant stated, "You got me." SA Grabman then sought out two other agents to witness appellant signing a form acknowledging his Miranda rights at 2021 and several incriminating admissions which followed. SA Grabman then took appellant into custody. Finding no contraband in the car, the Federal agents permitted the other members of appellant's party to continue on their way to New York.

At about 2140, after sharing in cake and juice with appellant at a Maryland State police barracks, SA Grabman and SA Spigener of the NIS sat down to interview appellant and try to obtain further information. They advised appellant of his rights under Article 31, UCMJ, and Miranda-Tempia. Appellant acknowledged his understanding of those rights in writing and executed a written statement which contained incriminating admissions. He also consented to various searches which uncovered handguns at several locations. Appellant admitted to having ground off the serial numbers from most of these guns. 44 M.J. at 769.

Other facts relevant to the issues in this case are contained in the record. SA Galupo was the supervisor present at the scene when the Maryland State Trooper stopped the ATF vehicle for speeding. She testified that she had her agent solicit the assistance of Trooper Pearce to stop Appellant for speeding "because he was a danger to . . . himself," and because

she was "concerned for the agents." The special agent conveyed to the trooper that besides speeding, Appellant had been observed during the surveillance "following too closely," "switching lanes," and "driving on the shoulder." SA Grabman had also observed Appellant driving at speeds in "excess of 85 miles an hour." SA Galupo insisted that the purpose for soliciting the trooper's assistance was not to obtain a consent search. Specifically, her testimony was, "I'm not going to tell a trooper to stop a car unless he sees a violation." SA Galupo further testified that although the agents did not have probable cause to arrest Appellant on the interstate, they believed they had reasonable suspicion that he was transporting firearms in his vehicle. Last, prior to asking Appellant for his consent to search, Trooper Pearce advised him that the objective was to search for "controlled dangerous substances, firearms or contraband of any kind."

### PROCEDURAL BACKGROUND

Prior to trial, the defense sought the assistance of the Government to obtain NBC video recordings of the traffic stop. NBC had shown images of the event during one of its news segments. The Government served a subpoena on NBC dated February 24, 1992 for: "NBC videotape of a traffic stop of Jorge Rodriguez by agents of the Bureau of Alcohol Tobacco & Firearms shot on May 3, 1991 along I-95 in Maryland. Video was seen on

NBC Nightly News.  Jim Polk was the reporter."  It served a second subpoena dated February 28, 1992, for: "All NBC recordings, video, audio or written produce [sic] between 17 Feb 91 and 8 May 91 involving the purchase, sale or transport of firearms which may relate to YN1 Jorge Rodriguez."  NBC responded by honoring the request for the materials broadcast during its televised news segment, but it asserted a First Amendment news-gathering privilege regarding production of videotape outtakes and reporter notes.

Because the Appellant entered a period of unauthorized absence from March 19, 1992 to August 24, 1993, no further proceedings took place and the Government chose to withdraw the charges without prejudice.  When Appellant was once again under control of military authorities, the charges were referred anew to a second court-martial.  The defense renewed its request to compel discovery of any remaining NBC videotapes.  In response to this motion, the Government served a third subpoena on NBC requesting the same material as the subpoena dated February 28, 1992.  NBC responded as it had to the February 28 subpoena asserting a First Amendment privilege regarding any outtakes and reporter notes.

At a session pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), the defense moved to compel enforcement of the subpoena and to suppress Appellant's statements made at the

8

traffic stop and at the police barracks.  After making findings of fact and conclusions of law on both issues, the military judge denied the motions.

DISCUSSION

I

The Motion to Compel Production

In his pre-trial motion, Appellant sought to compel production of NBC video recordings "involving the purchase, sale or transport of firearms which may relate to Petty Officer Rodriguez."  According to the defense the videotape footage from the May 3 traffic stop "was the only objective evidence of the actions of the government" that would enable the defense to challenge the voluntariness of Appellant's statements.  At the time of the Article 39(a) session, the parties were in possession of the broadcast version of the NBC tape recording.  At the outset of the hearing, the military judge attempted to ascertain whether the requested outtakes existed.  The parties agreed to stipulate to certain facts, but at the end of the discussion the question whether the tapes existed was still left unanswered.  At that point the following colloquy took place between the assistant trial counsel (ATC), the military judge (MJ), and the defense counsel (IMC1):

> ATC: . . . I don't mind stipulating to these facts,
> Your Honor, but it still does not clarify that

> there is any tape in existence.  I guess that's
> the point.
>
> MJ:  I agree, it does not.
>
> IMC1: Your, Honor, no evidence has been offered that
> there is no tape not in existence.
>
> MJ:  Agreed.  We don't have any evidence on that point
> at all.

The Government argued on the motion that the defense had failed to show that the requested tapes existed.  Trial counsel asserted that the defense could have availed itself of a number of means to ascertain the existence of the tapes such as calling NBC officials.  According to trial counsel, not having availed itself of such means, the defense had also failed to demonstrate that the requested matter was relevant and necessary.  In response, the defense reiterated that the requested material was relevant and necessary and that it was the Government's obligation to provide such evidence.  Defense counsel's argument did not touch on what measures, if any, the defense had taken to ascertain the existence of the tapes.  Later, the military judge made the following relevant findings:

> Three, under [Rule for Courts-Martial] R.C.M. 703
> (f)(1) and (2), each party is entitled to the
> production of evidence which is relevant and
> necessary, but is not entitled to the production of
> evidence which is destroyed, lost, or not otherwise
> subject to compulsory process.  The position of NBC is
> that this evidence is not subject to compulsory
> process because it is constitutionally protected.
> They do not assert that it does not exist.

Four, the authority of the military judge to assist with production of the unavailable evidence is spelled out in R.C.M. 703(f)(2). This presupposes a finding that the evidence is of such central importance to an issue that it is essential to a fair trial and there is no adequate substitute for the evidence.

Five, the defense argues that the entire video tape, not just the portion already viewed here in court, is relevant evidence on the question of the voluntariness of statements made to Agent Grabman. Certainly, the necessity of properly resolving the issue of the voluntariness of those admissions is essential to a fair trial, however, the video tape is not of central importance to that issue. Rather it is of little or no importance to that question. The testimony before the court on the motion to suppress the admissions, which I choose to migrate over to the motion to compel discovery, establishes that the video crew was focused on the conduct of the search. Testimony also establishes that discussions between Agent Grabman and Petty Officer Rodriguez, and between other ATF agents and Petty Officer Rodriguez, took place some distance away from where the search was taking place. The testimony does not establish that matters relating to the voluntariness issue were even video taped at all, particularly the actual discussions between Petty Officer Rodriguez and the ATF agents.

Six, the evidentiary value of that portion of the video that NBC did provide, now before the court as an appellate exhibit, is negligible in deciding the motion to suppress.

Seven, there is adequate testimony of witnesses at the scene, and I include here the objective testimony of Ms. Soto [aunt of the appellant's daughter], that can serve as a substitute for the video even if it were central to the issue of voluntariness of the admissions.

Eight, I conclude that the entire video tape is unnecessary to fairly resolve the issues before the court in connection with the suppression motion.

In contrast to the trial judge, the DuBay hearing judge had the benefit of testimony from representatives of NBC as well as an affidavit from the news correspondent who had filed the story. The DuBay judge found "most persuasive" the sworn affidavit of the NBC correspondent stating that his videographer had not obtained any footage of communications between Appellant and any law enforcement officials. The judge made two significant findings relevant to this issue. First, he found that at the time of the DuBay hearing, "any videotape that was the object of the subpoenas in this case, and that was not heretofore provided, no longer exists." Secondly, he found that "no videotape of an interrogation of the appellant was made."

The Court of Criminal Appeals adopted the findings of the DuBay judge and reaffirmed its earlier decision upholding the denial of Appellant's motion to compel production because the "videotape outtakes were neither necessary nor clearly of central importance and essential to a fair trial on the issue of voluntariness." Rodriguez, 57 M.J. at 772.

Appellant now argues that he was unable to demonstrate the relevance and necessity of the tapes because "he had no access to the videotaped footage that would show the circumstances of [his] seizure." The Government argues the outtakes, if they existed, were cumulative and unnecessary given the fact

witnesses to the events testified at the original Article 39(a) session.

We review a military judge's ruling on a request for production of evidence for an abuse of discretion. United States v. Breeding, 44 M.J. 345, 349 (C.A.A.F. 1996)(denial of a request for additional witnesses).

Parties to a court-martial are entitled to an "equal opportunity to obtain witnesses and other evidence[.]" Article 46, UCMJ, 10 U.S.C. § 846 (2000). The UCMJ and the Rules for Courts-Martial [hereinafter R.C.M.] also include the right to compulsory process. Id.; R.C.M. 703(a). "Each party is entitled to the production of evidence which is relevant and necessary." R.C.M. 703(f)(1). Military Rule of Evidence 401 [hereinafter M.R.E.] defines relevant evidence as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence is "necessary when it is not cumulative and when it would contribute to a party's presentation of the case in some positive way on a matter in issue." R.C.M. 703(f)(1) discussion. The burden of persuasion on a motion for appropriate relief is on the moving party. R.C.M. 905(c)(2)(A), 906(b)(7).

At trial Appellant insisted that the requested outtakes were relevant and necessary because they were the "best evidence available" as to whether the Appellant's rights were violated. The Government is obligated to produce by compulsory process evidence requested by the defense that is "relevant and necessary." R.C.M. 703(c)(1). However, it was the defense, as the moving party, who was required as a threshold matter to show that the requested material existed. Appellant failed to meet this burden. Defense counsel's response that "no evidence has been offered that there is no tape not in existence" attempted to invert this burden. The record does not reflect that Appellant attempted to gain access on his own. Nor is there indication that representatives of NBC would have been uncooperative had his counsel attempted to contact them regarding the existence of the outtakes. Although NBC had indicated an intent to assert a First Amendment privilege, it responded to the Government's requests. It seems in retrospect that the parties might have obviated this issue had they done what the DuBay judge did, that is, procured testimony or affidavits to resolve whether any footage existed relevant to Appellant's specific claim. Instead, Appellant's position at trial appeared to assume the existence of the outtakes and to further assume their evidentiary value.

Based on the foregoing we conclude that Appellant did not carry his burden as the moving party to demonstrate that the outtakes he requested existed.  Consequently, he did not show that they were relevant and necessary and should have been produced through compulsory process.  We hold that the military judge did not abuse his discretion in denying Appellant's motion to compel production.

II

We next address whether an unlawful seizure of Appellant's person occurred before or during the roadside stop.  Appellant seeks to suppress his roadside admissions to the ATF on the grounds that they were the product of an unlawful seizure.  Appellant further argues that his confession at the Maryland State Police barracks and any subsequently obtained physical evidence were derivative of his unlawful roadside seizure and should have been suppressed at trial.

We review a military judge's ruling on a motion to suppress for abuse of discretion.  United States v. Monroe, 52 M.J. 326, 330 (C.A.A.F. 2000).  "[W]e review factfinding under the clearly-erroneous standard and conclusions of law under the de novo standard."  United States v. Ayala, 43 M.J. 296, 298 (C.A.A.F. 1995).  On mixed questions of law and fact, such as the instant issue, "a military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of

15

law are incorrect."  Id.  "In reviewing a ruling on a motion to suppress, we consider the evidence 'in the light most favorable to the' prevailing party."  United States v. Reister, 44 M.J. 409, 413 (C.A.A.F. 1996)(citations omitted).

Our analysis necessarily travels through a continuum of time and shifting Fourth Amendment context as Appellant argues in the alternative that if he was not unlawfully seized on the highway he was subsequently unlawfully seized at different times while on the roadside.  On appeal the parties also present disparate perceptions regarding the critical events.  Our focus, of course, remains on the facts established in the record and the military judge's findings of fact.  In this context, we will address the facts and Appellant's arguments in chronological order.  We begin with a brief review of the legal framework applicable to Appellant's arguments.

Seizures Under the Fourth Amendment

Police encounters generally fall into one of three categories: arrest, investigatory stop, or consensual encounter. United States v. Williams, 365 F.3d 399, 403 (5th Cir. 2004); United States v. Ringold, 335 F.3d 1168, 1171 (10th Cir. 2003); United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002).  The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  Arrests and investigatory stops are considered

seizures within the meaning of the Fourth Amendment and require a predicate degree of suspicion. An arrest must be supported by probable cause and can be effected by physical force or submission to a show of authority. California v. Hodari, 499 U.S. 621, 626 (1991); Wong Sun v. United States, 371 U.S. 471 (1963); see Brown v. Illinois, 422 U.S. 590 (1975). An investigatory stop or detention, also known as a "Terry stop," must be supported by reasonable suspicion that "criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968). But "[s]o long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." Florida v. Bostick, 501 U.S. 429, 434 (1991)(citation omitted). See United States v. Phillips, 30 M.J. 1 (C.M.A. 1990)(reviewing Supreme Court precedent over time). Supreme Court case law provides illustrative examples of circumstances indicative of seizure, such as the threatening presence of several officers, the display of weapons by officers, physical touching of the person or the use of language or tone indicating that compliance with the officers' requests might be compelled. United States v. Mendenhall, 446 U.S. 544, 554 (1980). "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." Bostick, 501 U.S. at 434. "Even when officers have no basis for suspecting a particular

individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage, -- as long as the police do not convey a message that compliance with their requests is required." Id. at 434-35 (citations omitted). The critical question remains "whether a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter." Id. at 436. See Michigan v. Chesternut, 486 U.S. 567, 569 (1988).

A.  The Moving Surveillance

Appellant first asserts that he was seized in violation of the Fourth Amendment when the agents' vehicles "boxed him in" while traveling on the interstate. Appellant characterizes the tactic employed by the agents as a "moving roadblock" amounting to a seizure.

Appellant testified that he drove up behind the car in front of him because it was driving slowly. Using the tactic that some drivers use of "flash[ing] their high beams so they can see that somebody is coming up at a fast rate," Appellant sought to induce the vehicle in front of his to change lanes.

The record reflects that Appellant was not aware of the police presence around his vehicle until he was pulled over by Trooper Pearce of the Maryland State Police. The record does not reflect that Appellant was prevented from slowing to a speed

that would have kept him a safe distance from the vehicle in front of him. Nor does the record reflect that Trooper Pearce was a conscious participant in a gambit to box Appellant in. The military judge found that the ATF vehicle in front of Appellant's vehicle "did not swerve into the passing lane in an effort to entrap [Appellant's] vehicle[.]" It "was simply proceeding . . . albeit a little slower speed than normal[.]"

Based on an objective review of the totality of these circumstances the military judge's conclusion was correct. Appellant was not seized by the ATF and Maryland State Police as part of a moving roadblock. Not only was Appellant free to leave, by slowing down or changing lanes, he was not aware that he was engaged in a police encounter. A reasonable person in Appellant's situation would have felt the same. Thus, Appellant has not carried his burden of demonstrating that the military judge's findings are clearly erroneous.

## B. The Request for Consent to Search the Vehicle

Appellant was subsequently pulled over by Trooper Pearce and issued a warning citation for following too closely. Appellant contends that he should have been permitted to leave following issuance of the citation without further questioning. According to Appellant, Trooper Pearce's request for consent to

search his vehicle initiated a subsequent detention.  In essence, he contends he was seized without reasonable suspicion.

Here the testimony of Trooper Pearce and Appellant indicates the interaction between the two was conversational rather than confrontational in nature.  Appellant's testimony does not suggest that the trooper's tone or demeanor was intimidating or threatening.  Trooper Pearce described Appellant as "polite and cooperative."  The parties agree that following the issuance of the citation, Appellant was asked to consent in writing to a search of his car.  The form indicated that he could refuse consent to search.  Appellant signed the form.  The record does not reflect that Appellant asked to leave or attempted to leave following his citation.  Based on these facts, the military judge found Appellant's consent to search voluntary.

Considering all the circumstances surrounding the encounter with Trooper Pearce contained in the current record, we conclude that Appellant has not met his burden of demonstrating that he did not reasonably "feel free to decline the officer's requests or otherwise terminate the encounter."  Military Rule of Evidence 311(e)(1) provides that "[w]hen an appropriate motion [to suppress] . . . has been made by the defense . . . the prosecution has the burden of proving . . . that the evidence was not obtained as a result of an unlawful search or

seizure[.]" However, section (e)(3) of that rule states that "the burden on the prosecution extends only to the grounds upon which the defense moved to suppress or object to the evidence." At trial, defense counsel's position was that Trooper Pearce's traffic stop was without probable cause or reasonable suspicion because it was nothing more than a pretext for allowing the ATF to conduct the search of Appellant's car. According to counsel, that was the point at which Appellant's illegal seizure occurred. Counsel did not assert that an additional or further illegal detention had occurred because Trooper Pearce had asked Appellant for his consent to search following conclusion of the traffic stop. Had the particular grounds for suppression now asserted by Appellant been litigated at trial, a more expansive record might have resulted. As it stands, Appellant is left to make this newer claim on the present state of the record.

"A motorist's expectations, when he sees a policeman's lights flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way." Berkemer v. McCarty, 468 U.S. 420, 437 (1984). There came a time during Appellant's stop when he was issued a traffic citation. And there came a point when Appellant signed a written consent to a search of his vehicle.

Appellant has not shown that after receiving the citation Trooper Pearce prevented him from leaving, for example, by physically blocking his vehicle, engaging in questioning, or otherwise signaling to Appellant that he was not free to leave. Accordingly, considering the record in the light most favorable to the prevailing party we conclude that after the brief detention for the traffic stop concluded, the encounter between Appellant and Trooper Pearce was consensual in nature and not a seizure subject to Fourth Amendment scrutiny.

C. Was Appellant Subsequently Seized by ATF?

After Appellant responded affirmatively to Trooper Pearce's request to search his vehicle, "ten or so" ATF agents arrived almost immediately and began to search Appellant's car. The military judge found that that there was "[e]ncouragement to cooperate from various ATF agents." The appellate question is whether this change in circumstance transformed Appellant's consensual encounter with Trooper Pearce into an unlawful Fourth Amendment seizure.

(1) Testimony at the Article 39(a) session.

At the suppression hearing SA Grabman testified that shortly after he arrived at the scene, he asked Appellant to step away from his friends so that he could talk with him. According to SA Grabman, the first thing he did was read

Appellant his Miranda rights before engaging in a discussion with him about gun purchases. Appellant denied any wrongdoing. SA Grabman then asked Appellant to sit with him in an ATF vehicle so that he could reveal to Appellant the results of surveillance efforts that had been conducted into his activities. After becoming aware of the ATF surveillance into his activities, Appellant uttered the admission, "All right, you got me." At this point SA Grabman again advised Appellant of his Miranda rights and had him sign a form acknowledging his rights and agreeing to waive them. Appellant then confessed to purchasing handguns with the intent to sell them unlawfully to another individual. As the search of the vehicle was concluding, SA Grabman allowed Appellant to see his friends off. Appellant and the agents then proceeded to a nearby state police barracks where Appellant signed another rights advisement form and authored a written confession. SA Grabman also testified that Appellant never asked to leave or terminate the encounter and that he never made any threatening remarks to Appellant.

Appellant's testimony conveyed a different version of the events. He stated that he was not given his rights until he was at the state police barracks. Moreover, according to Appellant, he did not make any incriminating statements until he was at the barracks, at which point he had already been arrested without probable cause. He also stated that during the roadside

encounter with ATF agents he repeatedly told the agents that he wanted to leave. He further stated that SA Grabman threatened that he would never see his daughters again unless he cooperated. Appellant testified that his interaction with Grabman took place outside the ATF car, while the search of his car was underway. According to him, he was placed in the ATF car only at the end of the search after his friends had driven away.

In order to rule on Appellant's suppression motion the military judge was necessarily required to weigh the contested facts relating to the circumstances of the encounter between SA Grabman and Appellant. The military judge found that Appellant had been given his rights by SA Grabman prior to making any incriminating statement to him. The judge concluded that no threats, promises, or inducements were used to elicit Appellant's statement. Implicit in this finding is a judgment by the military judge that Appellant did not repeatedly ask to terminate the encounter as he asserted. The military judge also found that the consent search of Appellant's car by Trooper Pearce began at 1952 and that at approximately 2010 Appellant made his first admission establishing probable cause for his arrest. The judge concluded that during this period Appellant was not under arrest and that essentially, the encounter continued to be consensual in nature, given the fact Appellant

had consented to the search by Trooper Pearce.   The military judge also made the following findings on the issue of reasonable suspicion:

> 10.   [Petty Officer (PO)]PO Rodriguez had himself purchased several handguns from various Virginia gun shops in the weeks before 3 May 91.
>
> 11.   PO Moore had purchased several handguns from various Virginia gun shops in the several days before 3 May 91 and had transferred the handguns he purchased to PO Rodriguez in the days before 3 May 91.
>
> 12.   Agent Grabman observed two of the transfers of firearms from PO Moore to PO Rodriguez; these transfers were accomplished by PO Moore purchasing the firearms and then placing them in PO Rodriguez'[s] vehicle.
>
> 13.   Having visually observed these transfers from PO Moore to PO Rodriguez, there was a reasonable basis for ATF to conclude that the purchases by PO Moore were "straw purchases" made, in fact, by PO Rodriguez.
>
> 14.   The supervisory ATF agent on scene on 3 May 91, Agent Galupo, was aware of those matters set forth in Findings # 10, 11, 12, and 13; additionally agent Galupo believed that PO Rodriguez was born in New York City and had family ties there and believed PO Rodriguez was planning a trip there on 3 or 4 May 91.

Based on theses findings, the military judge concluded that even if the traffic stop were to be viewed as a Fourth Amendment seizure the agents possessed reasonable suspicion that at least some of the handguns purchased by YN1 Moore and Appellant would be in the vehicle as it traveled toward New York.

(2) Law Applied

Whether the reasonable limits of an investigatory stop have been exceeded thus transforming a seizure into an arrest is not based upon clear black letter distinctions.  United States v. Sharpe, 470 U.S. 675, 685 (1985).  Rather, like so much else in Fourth Amendment analysis, courts look to a totality of the circumstances and contextual factors to determine if "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest."  United States v. Ienco, 182 F.3d 517, 523 (7th Cir. 1999)(quoting United States v. Corral-Franco, 848 F.2d 536 (5th Cir. 1988)).  See also State v. Cojoe, 828 So.2d 1101, 1104 (La. 2002); People v. Cervantes-Arredondo, 17 P.3d 141, 146 (Colo. 2001); 3 Wayne R. Lafave, Search and Seizure: A Treatise on the Fourth Amendment § 5.1(a), at 2 (3d ed. 1996).  In distinguishing between an investigatory stop and arrest, courts look to among other factors: the mode of restraint, including whether handcuffs are used; whether guns are used in effecting restraint; the nature of the crime in question, the location of the stop and the location of restraint, including whether the individual is placed within a law enforcement vehicle or the stop occurs in public view; the subject's reaction; the scope of authority used to effect the stop; and, the duration of the

detention.  4 LaFave at § 9.2(d) at 33-46.  If police conduct amounts to an arrest, then such conduct must rest upon probable cause.

The question of law for this court is whether or not Appellant's roadside encounter with ATF was consensual, and if not, whether the encounter constituted an arrest supported by probable cause, or an investigatory stop supported by reasonable suspicion.  These questions are particularly relevant because SA Grabman conceded in his testimony that ATF did not possess probable cause to stop and arrest Appellant at the time for transporting firearms in his vehicle.  However, the Government argues, the agents did have reasonable suspicion.

Looking at the totality of the circumstances, two significant facts bear upon this question.  First, Appellant testified that very shortly after Trooper Pearce began his search, between 10 to 12 agents arrived on the scene.  The Court of Criminal Appeals found that Trooper Pearce was assisted by "ten or so" ATF agents.  Second, the military judge found that "[e]ncouragement to cooperate from various ATF agents then present did not vitiate that voluntariness . . . ."  Although Appellant challenges the legal conclusion regarding voluntariness, the factual finding as to the agents is consistent with Appellant's testimony that at one point he was

27

surrounded by four to five agents who were "telling [him] that [he] should cooperate."

In our view, these circumstances amounted to a seizure as opposed to a consensual encounter. Although the military judge found "no unlawful inducements, promises, or threats were made to or against [Appellant]," the transition from the Maryland State Police encounter to the ATF search nonetheless involved a substantial display of authority. Added to this display of authority is the fact that Trooper Pearce obtained Appellant's consent to search partly based on his statement that it would be a "routine search." Notwithstanding the fact that the consent form indicated that Trooper Pearce could obtain assistance from other officers, we are not persuaded that a reasonable person would have anticipated that a force of 10 to 12 officers would descend upon the scene to conduct an intense search of his vehicle and begin questioning him. Under these circumstances a reasonable person would not have felt free to decline the agents' requests and terminate the encounter. Therefore, we hold that Appellant's initial consensual encounter with Trooper Pearce evolved into a Fourth Amendment seizure between the time SA Grabman and the other agents arrived and when Appellant made his first admission.

Although close, we further conclude based on this totality of circumstances that Appellant's seizure was an investigatory

detention rather than an arrest.  On the one hand, the ATF's arrival on the scene was heralded with a significant display of authority.  Appellant found himself answering questions while surrounded by several agents.  On the other hand, there is no evidence that the ATF agents brandished their weapons or handcuffed Appellant.  He was not precluded from speaking to his passengers, although there is no indication that he tried to communicate with them.  Although Appellant was surely surprised, there was no force used, and the military judge did not find that Appellant was overwhelmed by the circumstances on the highway.  Most importantly, the period between the stop and his first admission lasted no more than twenty minutes.  As a result, the predicate for Appellant's detention was reasonable suspicion on the part of the agents.

The military judge found that the agents possessed reasonable suspicion that Appellant was transporting one or more handguns for unlawful resale as he traveled north on Interstate 95.  The fact that the agents did not act until after Appellant had given Trooper Pearce his consent to search, did not invalidate this reasonable suspicion.  We review issues involving reasonable suspicion de novo.  United States v. Robinson, 58 M.J. 429, 432 (C.A.A.F. 2003).  Among other things, the military judge found that the stop was based on law enforcement surveillance indicating a pattern of apparent "straw

29

purchases" by Appellant and YN1 Moore during the few days leading up to the events of May 3. The surveillance also indicated that Appellant had not sold the guns in question. Further, ATF had received a tip from a confidential informant that Appellant would be traveling to New York, suggesting to the agents the possibility of the interstate transport and sale of the guns in question. On the day of Appellant's trip to New York, the agents observed Appellant carrying bags to and from his vehicle, which could plausibly have contained the guns in question. These findings of fact by the military judge are not clearly erroneous. And we conclude as a matter of law that Appellant was the subject of a lawful investigatory stop supported by reasonable suspicion and that his subsequent statements were admissible.

III

Article 31(b) Rights

Next, Appellant argues that because SA Grabman turned him over to the NIS agents after the interview at the police barracks, SA Grabman was acting as an instrumentality of the military. Alternatively, the cooperation between the two was such that the two investigations merged into one. As a result, Appellant argues, SA Grabman was obligated to advise Appellant under Article 31(b) of the code before interrogating him along I-95.

Article 31(b) provides that:

No person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

Under Military Rule of Evidence 305(b)(1), a person subject to the code "includes a person acting as a knowing agent of a military unit or of a person subject to the code."  In the past, this Court has set forth at least two instances when civilian investigators working in conjunction with military officials must comply with Article 31: "(1) When the scope and character of the cooperative efforts demonstrate 'that the two investigations merged into an indivisible entity,' and (2) when the civilian investigator acts 'in furtherance of any military investigation, or in any sense as an instrument of the military.'"  United States v. Penn, 18 C.M.A. 194, 199, 39 C.M.R. 194, 199 (1969)(citations omitted).  See also United States v. Lonetree, 35 M.J. 396 (C.M.A. 1992); United States v. Quillen, 27 M.J. 312, 314 (C.M.A. 1988).

In Penn, the question arose in the context of a Secret Service investigation into the forgery of United States treasury checks.  The Secret Service Agents asked the Air Force Office of Special Investigations (OSI) for its assistance in apprehending

31

an individual who had driven a car during an incident at one of the banks. After being provided the license plate number, OSI agents learned that the vehicle was registered to a service member named Pinkney. Pinkney informed the OSI agents that his superior and Penn were the only ones who had used his car on the day in question. Penn was called to the OSI office and admitted he had used the car and admitted to trying to cash a forged check at the bank. The OSI agents then searched Pinkney's car and found several government checks including the one Penn had attempted to cash. This in turn led to a search of Penn's wall locker where more incriminating evidence was discovered. Penn was subsequently placed in confinement. The following morning, the OSI agents informed the Secret Service that Penn was in custody. The OSI agents turned over the evidence they had obtained the previous day to the Secret Service. Penn was taken from the confinement facility by Secret Service agents and later interrogated. During the interrogation, Penn provided two handwriting exemplars. Although the Secret Service agents advised Penn of his right to remain silent and his right to counsel, they did not inform him of his Article 31 rights before questioning him.

At trial, the admissibility of the exemplars was in issue. The question turned on the independent nature of the concurrent civilian and military investigations. Among other factors, this

32

Court noted that the chain of investigative events began with the Secret Service and that the agents had explained to Penn the nature of the offenses that constituted the subject matter of the Secret Service investigation. This Court concluded that the Secret Service agent was conducting a Secret Service investigation according to its procedures rather than a continuation of the military investigation and held the two investigations to be separate and independent for the purposes of Article 31. Id. at 202, 39 C.M.R. at 202.

The parties do not dispute that SA Grabman suspected Appellant of weapons trafficking and questioned him about those activities during the vehicle search without advising him of his Article 31(b) rights. The question is whether because of the degree of coordination between ATF and NIS the two investigations remained separate and independent or whether they merged into an "indivisible entity" requiring SA Grabman to comply with Article 31(b). Appellant urges that we answer the question in the affirmative because ATF and NIS conducted joint surveillance and ATF released Appellant to NIS control after the vehicle search.

We begin by noting that SA Grabman testified that he initiated the investigation sometime during February or March and later contacted NIS upon learning of Appellant's status in the Navy. Appellant was under surveillance for five days,

between April 29 and May 3, 1991.  During this period ATF and NIS conducted joint surveillance of Appellant's home and work, and NIS conducted some independent surveillance at the Navy Annex.  But the decision to act on the informant's tip and pursue Appellant along I-95 on May 3 lay solely with ATF.  So, too, did related operational decisions, including coordination with the Maryland State Police, and the initial questioning of Appellant.  Although NIS agents participated in the surveillance, they arrived upon the traffic stop after ATF had begun the search and questioning.  There is no indication in the record that NIS participated in the subsequent search or controlled any operational decisions.  Finally, it was only after the ATF determined that Appellant was not in possession of firearms that it surrendered him to NIS control.

We reject Appellant's contention that the NIS surveillance role during the five-day period amounted to a military investigation that merged indivisibly with the ATF efforts. Nor, does the record reflect that SA Grabman became an instrument of the military during the course of these events. Rather, ATF was running its investigation with NIS in tow, providing surveillance support.  Therefore, we conclude that SA Grabman was conducting a separate and independent ATF investigation when he questioned Appellant at the roadside and

was not required to inform Appellant of his Article 31(b) rights.

IV

Attorney-Client Relationship During DuBay Hearing

The DuBay hearing ordered by this Court was conducted in four sessions between November 1998 and January 2000. Appellant's detailed defense counsel, Lieutenant (LT) Velez, attended the first two sessions on November 6, 1998, and May 5, 1999. At the first session, Appellant waived his presence at subsequent sessions in order to benefit from "extra good time" credit that he could earn only while confined. The military judge discussed Appellant's decision with him on the record:

> MJ: . . . But, I guess what I just want to make sure is that you're not being sort of blinded by the need to get the seven days extra credit at Levinworth [sic], such that you're not being thoughtful when you waive your presence. From what you've said to me, you've thought it through, you've discussed it with Lieutenant Velez, you and I have discussed it as well. And it's just something is [sic] your best interest and is something that is not going to do any harm to you for the limited purposes of answering these questions. Is that alright?
>
> ACC: Yes, sir.

At some point between the second and the third sessions, LT Velez was reassigned, and for the final two DuBay sessions, October 5, 1999, and January 10, 2000, LT Hoole appeared on the

record and represented Appellant. There is no indication that Appellant released LT Velez as his appointed counsel prior to LT Hoole's appearance. Nor, is there any indication that she was excused by competent authority for "good cause shown." R.C.M. 505(d)(2)(B)(iii).

When Appellant's case was again before the Court of Criminal Appeals, Appellant assigned an issue for review specifically related to the DuBay hearing.[4] LT Velez and LT Hoole (now Mr. Hoole) submitted affidavits to the lower court. Now Lieutenant Commander (LCDR) Velez states that she does not recall Appellant releasing her from representation, or more generally, "how I was released from the case." "What I recall," LCDR Velez states, "is that the appellant did not sign any documents releasing me from representing him at the hearing." Mr. Hoole's affidavit indicates that he recalls receiving a detailing letter to the case and that the letter contained a mis-reference to Hospitalman Hector Rodriquez rather than YN3 Jorge L. Rodriquez, the subject of his representation and this appeal. Mr. Hoole's affidavit also states that

---

[4] This issue was framed more generally than the issue framed for this Court:
> VI. YN3 RODRIGUEZ'S EVIDENTIARY (DUBAY) HEARING FAILED TO COMPLY WITH THE CONSTITUTION OF THE UNITED STATES, UNIFORM CODE OF MILITARY JUSTICE, OR RULES FOR COURT-MARTIAL, TO THE SUBSTANTIAL PREJUDICE OF YN3 RODRIGUEZ.

> Upon being detailed I attempted to make contact with YN3
> Rodriquez to discuss matters in the case, most importantly
> LT Velez's proposed release as defense counsel. To the
> best of my recollection, we made attempts to contact YN3
> Rodriguez both on the phone and in writing at his home of
> record to no avail. We also attempted to discover his
> then-current address by searching through phone listings,
> internet searches, and searches on various LEXIS databases.
> These efforts were likewise unfruitful.

Appellant has not challenged the veracity of this affidavit, nor argued that counsel's efforts fell short as a matter of diligence. Rather, Appellant argues that having failed to establish an attorney-client relationship with LT Hoole, he was, in effect, unrepresented at the DuBay hearing.

The record also contains an appellate rights statement executed by Appellant on February 17, 1994, which includes the following pre-printed acknowledgment in paragraph e:

> I understand that in order for my trial defense counsel or
> any successor counsel to represent me properly, I must keep
> counsel informed of my current mailing address.

The lower court disposed of the issue in short form finding it "to be without merit of further discussion." 57 M.J. at 774.

In this Court, Appellant contends he was prejudiced at the DuBay hearing when then LT Velez improperly severed the attorney-client relationship with him and when then LT Hoole proceeded as substitute counsel without establishing an attorney-client relationship with him. Based on the state of the appellate record, we assume that these errors occurred.

37

But, we hold Appellant has not demonstrated that he was prejudiced during the hearing.

This Court has previously articulated principles for resolving issues related to substitute counsel that arise post-trial.  United States v. Howard, 47 M.J. 104 (C.A.A.F. 1997); United States v. Miller, 45 M.J. 149 (C.A.A.F. 1996); United States v. Hickok, 45 M.J. 142 (C.A.A.F. 1996).  These cases dealt with the period between sentencing and the convening authority's action when defense counsel is required to prepare clemency matters and review the staff judge advocates recommendation.  We identified this post-trial period as an "important stage."  Hickok, 45 M.J. at 145.  The principles enunciated in Hickok, Miller and Howard also apply to fact-finding hearings.  The absence of counsel at such a proceeding will effectively result in denial of the right to counsel.  Id. Denial of the right to counsel at an important stage "is legally presumed to result in prejudice."  Id.  However, "if counsel who has the legal responsibility to protect the accused's post-trial interests is present, it cannot be said that the accused has been deprived of his right to counsel."  Id.  In Miller we held that the error by substitute counsel of serving without first having entered into an attorney-client relationship could be tested for prejudice.  45 M.J. at 151.  And the appropriate

38

"test for prejudice" is that prescribed in Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2000).  Howard, 47 M.J. at 106.

In testing for prejudice, we are cognizant of the qualitative differences between the post-trial period before the convening authority's action and a fact-finding hearing ordered later by an appellate court.  Among other things, DuBay counsel are afforded the opportunity to play a more active adversarial role, engaging inter alia in oral advocacy, witness identification, and examination as well as written advocacy.  Thus, while it is appropriate to test for prejudice, each case will present different circumstances regarding the relationship between counsel and client and in the nature of the DuBay questions presented.  As a result, each case must be tested for prejudice on its own merits.  In this case, the DuBay hearing record indicates that the substitute counsel, then LT Hoole, was in fact present and represented Appellant's cause zealously.  He argued articulately against the applicability of a newsgathering privilege in the military.  He also competently discussed applicable Supreme Court precedent relevant to the issue.  Appellant's specific claim of prejudice is simply a restatement of the facts raising the issue.  His claim is that since LT Hoole never spoke to him, he never formed the requisite relationship, and thus, should never have represented him at the hearing.  Moreover, the record reflects that counsel made

39

efforts to contact Appellant, who did not himself fulfill his duty to advise counsel of his whereabouts. United States v. Cornett, 47 M.J. 128, 134 (C.A.A.F. 1997). Finally, the questions assigned for DuBay consideration did not relate directly to matters within Appellant's personal knowledge. Rather, the questions addressed matters of law relating to a First Amendment news gathering privilege, and matters of fact, involving whether or not NBC possessed videotape requested by the defense. Therefore, while not condoning what occurred, we conclude that based on these facts, in the DuBay context presented, Appellant has not demonstrated that he was prejudiced in the sense of Article 59(a) when substitute counsel represented him at the hearing without first establishing an attorney-client relationship.

V

## Appellate delay

Appellate review is an integral part of the military justice system, and the Due Process Clause guarantees that such review be conducted in a timely manner. Diaz v. Judge Advocate General of the Navy, 59 M.J. 34 (C.A.A.F. 2003). We test unreasonable post-trial delays for material prejudice. United States v. Tardif, 57 M.J. 219 (C.A.A.F. 2002); United States v. Williams, 55 M.J. 302, 305 (C.A.A.F. 2001)(citing United States v. Banks, 7 M.J. 92, 94 (C.M.A. 1979)).

Appellant asserts that an eight-year, nine-month period between sentencing and final action by the Court of Criminal Appeals was unreasonable. He further argues that he was prejudiced by this delay because his defense counsel was unable to continue representing him due to counsel's military reassignment. And because Appellant has been released from confinement he is unable to benefit from favorable decisions.

This case is not marked by appellate speed. Over a year transpired between the convening authority's action and the docketing of Appellant's case at the Court of Criminal Appeals. Appellant's initial Article 66(c), UCMJ, 10 U.S.C. § 866(c) (2000), review was completed within two and one-half years after the convening authority's action.[5] Once docketed, the time taken by the lower court to conduct its review was not uncommon or unreasonable for a case involving multiple complex issues of law and fact.

Discretionary review for good cause shown was subsequently granted by this court and a DuBay hearing ordered. This Court had the case for 489 days before ordering a DuBay hearing on the question of the NBC videotapes. The DuBay process itself took over 600 days. It was over two and one-half years after the

---

[5] This case is factually distinguishable from the situation presented in Toohey v. United States, 60 M.J. 100 (C.A.A.F. 2004).

41

United States v. Rodriguez, No. 97-0299/NA

DuBay hearing was ordered that the Court of Criminal Appeals issued a second decision in this case.

Appellant has made his case that there was a lengthy process of appellate review, and perhaps undue delay. However, Appellant has not made his case regarding prejudice. First, while a military member has a right to counsel, neither the Sixth Amendment nor Article 38(b), UCMJ, 10 U.S.C. § 838(b) (2000), confers a right to representation by a particular lawyer. Wheat v. United States, 486 U.S. 153, 158-59 (1988); see also United States v. Wiest, 59 M.J. 276, 281-82 (C.A.A.F. 2004)(Erdmann, J., dissenting). Appellant is not the first military member who has proceeded from court-martial to action or through various stages of an appeal with different military counsel as a result of rotation and the necessary duration of trial or appellate proceedings. Second, the fact remains that Appellant has not prevailed at this Court or the court below on the important questions of law presented and is not entitled to relief. Therefore, he has not been prejudiced for want of a meaningful opportunity for relief.

## DECISION

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

United States v. Rodriguez, No. 97-0299/NA

EFFRON, Judge (dissenting):

Six years ago, our Court concluded in the present case that "a factfinding hearing pursuant to United States v. DuBay, 17 USCMA 147, 37 CMR 411 (1967), is necessary (1) to fully develop the record on the issue of the news media's refusal to comply with the federal subpoena for the videotape requested by the defense in this case, (2) to establish the availability of the videotape for production and inspection, and (3) to address the applicability, if any, of a news-gathering privilege." United States v. Rodriguez, 50 M.J. 38 (C.A.A.F. 1998)(mem.).

The initial DuBay hearing was held on November 6, 1998. Appellant was then serving a sentence that included 10 years' confinement at hard labor. At the outset, Appellant offered to waive his right to be present at future proceedings because he feared that he would lose extra good time credit during periods that he was not physically present at the Fort Leavenworth military confinement facility. At that time, Appellant had not yet discussed the substantive matters at issue in the proceedings with his detailed military defense counsel.

Although defense counsel did not ask the military judge to address the adverse impact of attending the hearing on Appellant's confinement status, the military judge noted that there were possible avenues of redress, including a submission

to our Court.  The defense, however, did not seek relief from our Court, and there is nothing in the record indicating that the defense otherwise sought to ensure that Appellant did not suffer a loss of potential good time credit by attending the court-ordered hearings.

The military judge, who expressed significant concern about conducting the hearing in Appellant's absence, obtained an assurance from detailed defense counsel that she would "stay in communication" with Appellant and keep Appellant informed "of everything that's being done in his case."  Before accepting Appellant's waiver, the military judge told Appellant that he was "confident that I'll be alert and [detailed defense counsel] will be even more alert if anything comes up that requires information from you or a consultation with you that will be done."

During the initial session, defense counsel informed the military judge that the defense was considering a stipulation "to the fact that there's no tape, NBC no longer has a tape" and speculated as to whether that development would moot the need for a DuBay proceeding.  The military judge and the parties then discussed the possibility of submitting a motion to our Court advising us of that development with a view towards determining whether we would modify our order.

On January 25, 1999, defense counsel filed a "motion for clarification" with our Court, suggesting that the order for a DuBay hearing was moot in light of a stipulation of fact that had been agreed to by the parties. The stipulation stated that:

> 1. The non-broadcast videotape, including outtakes, relating to the 3 May 1991 highway stop of YN3 Rodriquez by ATF agents does not exist within NBC's custody or control.
>
> 2. NBC's practice regarding non-broadcast outtakes is to recycle those videotapes, unless otherwise instructed to maintain. To the best of the NBC Law Department's knowledge, no such instruction was given.

Shortly thereafter, we summarily denied the defense motion, thereby clearing the way for the DuBay hearing to proceed. United States v. Rodriguez, 51 M.J. 361 (C.A.A.F. 1999).

At the second DuBay session, on May 12, 1999, Appellant was represented by the same detailed defense counsel. Pursuant to the waiver executed at the prior hearing, Appellant did not attend the second session or any subsequent session.

Although our Court had rejected defense counsel's motion to modify the scope of our order, defense counsel nonetheless suggested to the military judge that the stipulation as to the non-existence of the videotape mooted the first prong of our order - the requirement to "fully develop[] the record on the issue of the News media's refusal to comply with a federal subpoena for the video tape [sic] requested by the defense in

this case." The military judge discouraged the defense from disregarding the importance of the first prong of the order, commenting: "Well, I don't know, if the tape no longer exists and [NBC] wrongfully did not produce them [sic] and there's prejudice presumed or shown, then the accused has a beef." The military judge also declined to accept defense counsel's suggestion that witness testimony was not necessary on the issue, indicating that he would give further consideration to the matter after reviewing any written submissions.

A third DuBay session was held on October 5, 1999. Appellant was not present, nor was the detailed defense counsel who had represented him at the prior proceedings. The record of the third session contains no explanation of detailed defense counsel's absence, the circumstances surrounding it, or the fact that a different person announced his presence as defense counsel.

The record contains no reference to the fact the defense counsel was new to the proceedings; nor does the record contain any statement as to the new defense counsel's qualifications and certification under Article 27(b), Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 827(b)(2000). The record simply sets forth routine statements by the military judge and counsel identifying themselves in terms of their names and the names of their clients.

4

The military judge did not inquire on the record as to whether the new defense counsel had been detailed properly to represent Appellant, nor did the military judge ascertain on the record whether the new counsel had established an attorney-client relationship with Appellant.  The final DuBay session, held on January 7, 2000, likewise is devoid of any consideration of the new counsel's qualifications or relationship to Appellant.

When these deficiencies in the record were identified during appellate review of the DuBay proceedings, the Government submitted three documents.  The first is a memorandum, dated June 10, 1999, from the "Commanding Officer, Naval Legal Service Office, North Central, Washington, DC" to the "Commanding Officer, National Naval Medical Center, Bethesda."  The memorandum asks the Commanding Officer at Bethesda to notify "HN Hector Rodriguez, USN," that a named lieutenant - the new defense counsel who appeared at the third session - had been detailed as his defense counsel, and that "the accused" should immediately contact that defense counsel.

The primary defect in the memorandum is that it directed the Commanding Officer at Bethesda to contact the wrong person - - "HN Hector Rodriguez."  There is nothing in the record indicating that anyone at Bethesda contacted Appellant - YN3 Jorge L. Rodriguez.  In fact, there is no indication in the

record that Appellant had any relationship to Bethesda, or that the command at Bethesda had any responsibility for the provision of legal services to Appellant. It is not apparent why the task of contacting Appellant was not assigned to an officer having authority over Appellant, such as the Commanding Officer at Fort Leavenworth or the commander of the naval organization to which Appellant was assigned.

The second document submitted by the Government is an affidavit executed by the first detailed defense counsel, the contents of which underscore the inattention of Appellant's counsel to the significance of the DuBay proceeding. After misidentifying the proceeding as a "hearing ordered by the Navy-Marine Corps Court of Criminal Appeals," the first defense counsel characterized her participation as involving "only administrative matters" - apparently overlooking her role in the waiver of Appellant's right to be present, her persistent efforts to convince the military judge that the substantive issues raised by our Court's order had been rendered moot, and her decision to address those issues without obtaining the live testimony of witnesses with first-hand knowledge of the creation and disposition of the videotape.

The affidavit also sheds little light on the circumstances surrounding her replacement by a second detailed defense counsel and the termination of her responsibilities to her client. The

6

first counsel noted that she was scheduled to detach from the defense counsel office in November 1999, and that a new defense counsel "was detailed to the hearing about four months prior to my scheduled detachment . . . . To my understanding, this was done in order to release me of all defense related duties so that I could concentrate on managing the Legal Assistance office at the Naval Hospital in Bethesda, MD."  She also stated that upon the assignment of new counsel, "I was told by the Department Head to turn my file of the case over to [the new counsel] and brief him on the case."

With respect to her termination of the attorney-client relationship with Appellant, she noted:

> [A]t the present time I have not been able to locate my paperwork on this case.
>
> I do not recall how I was released from the case.  What I recall is that the appellant did not sign any documents releasing me from representing him at the hearing.

There is no indication in the affidavit or otherwise in the record that she had any contact with Appellant regarding severance of the attorney-client relationship.  See Dep't of the Navy, Judge Advocate General Instruction 5803.1B [hereinafter JAGINST 5803.1B], Professional Conduct of Attorneys Practicing under the Cognizance and Supervision of the Judge Advocate General (2000), Rule 1.3 (Diligence)("A covered attorney . . .

shall consult with a client as soon as practicable and as often as necessary upon being assigned to the case or issue."); id. at Rule 1.4. (Communication)("A covered attorney shall keep a client reasonably informed about the status of a matter[.])." Despite the strong admonitions by the military judge that she maintain contact with her client when he waived his right to be present at the hearing, and her assurances that she would do so, there is no indication in the record that she had any contact with Appellant after December 1998.  There is no indication in the record that she made any attempt to ascertain the expected date of his release from confinement or that she made any arrangements to maintain contact with him while he was on appellate leave.

The third document submitted by the Government is an affidavit from the second detailed defense counsel.  After noting that his "recollection of the details" of his being detailed to represent Appellant was "limited" - emphasizing the confusion as to name of the client in the detailing letter - he offered the following description of his attempts to contact Appellant:

> Upon being detailed I attempted to make contact with [Appellant] to discuss matters in the case, most importantly [first detailed defense counsel's] proposed release as defense counsel.  To the best of my recollection, we made attempts to contact [Appellant] both on the phone and in writing

8

> at his home of record to no avail. We also attempted to discover his then-current address by searching through phone listings, internet searches and searches of various LEXIS databases. These efforts were likewise unfruitful.

Appellant was then, as he is now, a member of the Navy. At all pertinent times, he was either in confinement or on appellate leave. As such, he was subject to the authority of the Disciplinary Barracks at Fort Leavenworth and the commanding officer of the naval unit to which he was assigned. The vague recollections by both the first and second detailed defense counsel do not establish that either counsel contacted the responsible officers at Fort Leavenworth or within the Navy for information about Appellant. There is no indication in this record of a written request to any official from either counsel. Likewise, there is no indication in this record that either counsel sought assistance from naval investigative authorities in tracking down Appellant.

None of this was brought to the attention of the military judge. Given the serious concerns that the military judge had expressed about proceeding without Appellant's presence at the session, his personal commitment to Appellant that he would be kept informed, and the assurance of counsel that she would maintain contact with Appellant, the failure to notify the military judge was both inexplicable and inexcusable. The

failure to notify the military judge that an attorney-client relationship had been severed - and that the new counsel had not established such a relationship - not only affected the rights of Appellant, but also deprived the military judge of the opportunity to assess the impact of these developments on the proceedings in his courtroom.  There are a number of steps he could have taken, such as ordering trial counsel to obtain the assistance of naval authorities in locating Appellant, providing for a limited postponement of the hearing, or, at a minimum, ensuring that all pertinent facts concerning the attorney-client relationships and Appellant's absence were set forth on the record.

Under the Sixth Amendment to the Constitution, the accused in a criminal proceeding has the right to establish an attorney-client relationship and obtain committed and zealous representation by that attorney.  U.S. Const. amend VI; see, e.g., Argersinger v. Hamlin, 407 U.S. 25, 31 (1972); Gideon v. Wainwright, 372 U.S. 335, 344 (1963).  Protection of that right is so central to the military justice system that Congress has guaranteed the accused the right to representation by qualified counsel at Government expense, regardless of financial need, in all general courts-martial and virtually all special courts-martial.  Article 27, UCMJ.  The right to representation by qualified counsel applies in court-martial hearings convened

under <u>United States v. DuBay</u>, as reflected in the detailing of counsel in the present case.

Once an attorney-client relationship has been formed with a detailed defense counsel, a detailing authority may excuse or change the initially detailed counsel only when: (1) the client has obtained representation by individually requested military counsel under R.C.M. 506(b)(3); (2) detailed counsel is excused with the express consent of the client; or (3) the military judge permits detailed counsel to withdraw for good cause shown on the record. R.C.M. 505(d)(2)(B). <u>See United States v. Gray</u>, 39 M.J. 351 (C.M.A. 1993)(mem.); JAGINST 5803.1B, Rule 1.16 and cmt (Declining or Terminating Representation). None of these circumstances appears in this record.

In summary, the first detailed defense counsel erred by not obtaining the consent of Appellant or approval of the military judge to sever of the attorney-client relationship. The second detailed defense counsel erred by not informing the military judge that he was appearing as Appellant's counsel without having established an attorney-client relationship with Appellant. The military judge erred by not conducting an inquiry on the record regarding the circumstances surrounding the replacement of counsel that silently occurred in front of him.

The majority relies upon a preprinted form signed by Appellant in 1994, which stated: "I understand that in order for my trial defense counsel or any successor counsel to represent me properly, I must keep counsel informed of my current mailing address." ____ M.J. (37). I respectfully disagree with the suggestion that this standard form, signed in the immediate aftermath of trial -- more than four and one-half years prior to the DuBay hearing -- relieved either counsel or the military judge at the DuBay hearing of the specific responsibility, acknowledged by each on the record, to ensure appropriate contact with Appellant so that he would be provided with timely information about the DuBay proceedings.

The majority opinion also places the burden on Appellant to demonstrate the specific prejudice flowing from the error by making a colorable showing of possible prejudice, and concludes that Appellant has failed to meet that burden. ____ M.J. (42). The opinion relies on the standard we have used in cases involving post-trial submissions to the convening authority. I respectfully disagree.

Although post-trial submissions to a convening authority are an important aspect of the military justice system, the convening authority's action is not a court-martial proceeding. The accused has the right to make submissions to the convening authority in writing. There is no right to a hearing before the

convening authority. There is no subpoena power, no opportunity to present testimony, and no cross-examination of witnesses. The convening authority is not required to make findings of fact or reach conclusions of law. It is primarily an opportunity to seek clemency, a matter that is within the sole discretion of the convening authority. See Article 60, UCMJ, 10 U.S.C. § 860 (2000); R.C.M. 1105-1107.

Although detailed counsel frequently represents an accused in making submissions to the convening authority, substitute counsel may be appointed at that stage if detailed counsel has been relieved or is not reasonably available. R.C.M. 1106(f)(2). The cases cited in the draft opinion deal with failure of a properly appointed substitute counsel to establish an attorney-client relationship and do not involve the severance of an attorney-client relationship, continuity of counsel, or the role of the military judge in ensuring the fairness of an adversarial proceeding.

A DuBay proceeding, by contrast, involves hearings employing the powers of a court-martial, including discovery, compulsory process, application of the rules of evidence, and the right to call and cross-examine witnesses. The military judge makes findings of facts and enters conclusions of law on matters referred to the proceeding. In such a setting, the establishment of an attorney-client relationship, continuity of

13

counsel, and the role of the military judge in any change of counsel are critical to ensuring the reliability of the proceeding.

In the present case, Appellant faced the possibility of longer confinement as a result of attending a DuBay hearing ordered by our Court. Counsel did not seek redress from the military judge or from our Court, but instead facilitated Appellant's waiver of the right to attend the hearing, while assuring Appellant and the military judge that there would be continuity of communication. Counsel subsequently terminated the attorney-client relationship without informing the client or the court. A new counsel purported to represent Appellant without establishing an attorney-client relationship and without informing the court of that defect. The military judge observed the change of counsel without establishing any of the pertinent facts on the record. The affidavits submitted by both counsel underscore the absence of attentive and timely efforts to communicate with Appellant.

The only information in the record regarding the existence, content, and disposition of the videotape comes from the news media entity that sought to withhold the information from Appellant at trial and during appellate proceedings. The defense did not seek to subpoena, examine, or cross-examine any individuals with potential first-hand knowledge of these

14

matters.  It may well be that this is a simple case of a videotape that did not capture any matter pertinent to Appellant's trial, that the videotape was destroyed as a matter of routine, good-faith disposition, and that the burden of proving otherwise cannot be met by the defense.  Such conclusions, however, should not be drawn from a DuBay proceeding marred by failure to follow the basic requirements for establishment and termination of the attorney-client relationship.  In that context, the record does not provide an acceptable response to the questions referred by this Court for consideration in the DuBay proceeding.