# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39380**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Denis M. GUEU**
Captain (O-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 23 April 2019

————————————

*Military Judge:* Donald R. Eller, Jr.

*Approved sentence:* Dismissal and confinement for 3 years. Sentence adjudged 1 July 2017 by GCM convened at Spangdahlem Air Base, Germany.

*For Appellant:* Major Mark C. Bruegger, USAF; Brian L. Mizer, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Captain Peter F. Kellett, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, DENNIS, and LEWIS, *Appellate Military Judges.*

Senior Judge JOHNSON delivered the opinion of the court, in which Judge DENNIS and Judge LEWIS joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

JOHNSON, Senior Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of sexual assault of a child and one specification of sexual abuse of a child on divers occasions, both in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b. The

court-martial sentenced Appellant to a dismissal, confinement for three years, and forfeiture of all pay and allowances. The convening authority approved only so much of the sentence as included a dismissal and confinement for three years; in addition, the convening authority waived mandatory forfeitures for a period of six months for the benefit of Appellant's spouse and dependent children.

Appellant raises six issues on appeal: (1) whether Appellant's convictions are legally and factually sufficient; (2) whether Appellant is entitled to relief for unreasonable post-trial delay; (3) whether Appellant received ineffective assistance of counsel because of trial defense counsel's failure to adequately explore the victim's inconsistent statements and motives to lie; (4) whether Appellant received ineffective assistance of counsel because of trial defense counsel's failure to introduce certain evidence at his court-martial; (5) whether Appellant's sentence is inappropriately severe; and (6) whether the Government engaged in misconduct in relation to Appellant's prosecution.[1] We find no prejudicial error and we affirm the findings and sentence.

## I. BACKGROUND

Appellant married CG in December 1995. The couple had two children: NG, a daughter they adopted as an infant in 2000; and IG, a son who was born in 2002. In 2006, Appellant was commissioned as an Air Force chaplain. Appellant's first duty station was Dover Air Force Base, Delaware. In 2010, Appellant transferred to Joint Base Andrews, Maryland. In 2014, the family moved to Germany when Appellant was transferred to Spangdahlem Air Base (AB).

While the family lived in Maryland and Germany, NG told several of her friends that Appellant had touched her inappropriately. In 2012, NG told JR, who was a friend and schoolmate in Maryland, that Appellant "got drunk and got into bed with her and touched her breasts beneath her shirt and bra and said that he was giving her a breast cancer exam." Although NG appeared "really upset," JR did not report the incident because NG asked her not to. Years later, after NG moved to Germany, JR received a text message from NG stating that Appellant "performed what he called a virginity check on her. . . . [H]e went underneath her clothes, like underneath her -- underneath her pants and her underwear."

---

[1] Appellant personally raises issues (3), (4), (5), and (6) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). With respect to issue (6), we have carefully considered the alleged government misconduct Appellant cites. We find this issue does not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

Sometime in 2012 or 2013, NG told AG, who was another friend in Maryland, that Appellant had "started giving [NG] breast checks." Later, after Appellant's family moved to Germany, NG sent AG a text message that Appellant had "stuck his hands in her vagina." However, NG told AG she did not report it because NG "was scared because her mom [CG] couldn't afford to live by herself."

In February 2015, after Appellant had transferred to Spangdahlem AB, NG sent a text message to AD, one of her friends and schoolmates in Germany, stating Appellant "had touched [NG] in sexual places checking to see if she was a virgin and other stuff like that." In addition, NG wrote that Appellant had also touched her "inappropriately" before they came to Germany. AD did not report the incident because AD "was scared and because [NG] told her not to."

Finally, in January 2016, NG told HB, another friend in Germany, that "around the time [NG] started puberty her dad would . . . get in bed with her at night and show her things" and "pointed towards her crotch area." Although NG seemed "very sad" when she said this, HB did not initially report the incident because NG "made her promise not to tell anyone." However, a week later, HB told her father what NG had said. HB's father then informed Air Force authorities.

The Air Force Office of Special Investigations (AFOSI) interviewed NG on 25 and 26 February 2016. NG confirmed Appellant had touched her breasts both in Maryland and in Germany for the ostensible purpose of checking her for cancerous lumps or other health problems. Appellant would do this occasionally when he tucked NG into bed before she went to sleep. On some of these occasions, NG smelled alcohol on Appellant's breath. In these initial interviews, NG stated Appellant only touched her groin once, which occurred in Germany and did not involve penetration.

On 25 or 26 February 2016, Appellant received an order restricting his contact with his family and Appellant moved out of the family's off-base residence.

On 13 May 2016, NG reinitiated contact with the AFOSI. NG told investigators Appellant had performed five or six vaginal "exams" on her, ostensibly for health reasons. In particular, NG reported that, in February 2015, Appellant performed a "virginity check" on her by using his fingers to feel the opening of her vagina after Appellant learned NG had broken up with a boyfriend. At trial, NG explained she downplayed the extent of Appellant's inappropriate contact with her during the initial AFOSI interviews because she was afraid, because she did not want Appellant to go to jail, and because it took time before she was comfortable telling the AFOSI agents everything that had happened.

At trial, the court members convicted Appellant of one specification of sexual assault on a child by penetrating NG's vulva with his hand in Germany,[2] and one specification of sexual abuse of a child by touching NG's breasts with his hand on divers occasions in Germany with the intent to gratify his sexual desire, both in violation of Article 120b, UCMJ. The court members found Appellant not guilty of two additional specifications of sexual abuse of a child in violation of Article 120b, UCMJ, which alleged that Appellant touched NG's vaginal area with his hand in Germany and that Appellant touched NG's breasts with his hand on divers occasions in Maryland, both all with the intent to gratify his sexual desire.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. Article 66, UCMJ, 10 U.S.C. § 866; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325; *see also United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (citation omitted). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent

---

[2] Appellant was charged with committing this offense on divers occasions. However, at the close of the Government's case the military judge granted a defense motion for a finding of not guilty pursuant to Rule for Courts-Martial 917 with respect to the "on divers occasions" language based on NG's testimony describing only one such incident in Germany.

determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt."' *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "The term reasonable doubt . . . does not mean that the evidence must be free from conflict." *Id.* (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)).

### 2. Analysis

As the military judge instructed the court members, the elements of Specification 1 of the Charge, which alleged sexual assault of a child in violation of Article 120b, UCMJ, and of which Appellant was convicted, included the following:

> (1) That, at or near Herforst, Germany, between on or about 4 August 2014 and on or about 28 February 2015, [Appellant] committed a sexual act upon [NG], to wit: penetrating the vulva of [NG] with his hand; and

> (2) That at the time, [NG] had attained the age of 12 years, but had not attained the age of 16 years.

*See Manual for Courts-Martial, United States* (2012 ed.) (2012 *MCM*), pt. IV, ¶ 45b.a.(b). The military judge further instructed the members that "'[s]exual act' means the penetration, however slight, of the vulva of another by any part of the body or by any object, with an intent to abuse, humiliate, harass, or degrade any person or to arouse or gratify the sexual desire of any person." *See id.* at ¶¶ 45.a.(g)(1), 45b.a.(h)(1).

The military judge further instructed the court members that the elements of Specification 3 of the Charge, which alleged sexual abuse of a child in violation of Article 120b, UCMJ, and of which Appellant was convicted, included the following:

> (1) That, on divers occasions, at or near Herforst, Germany, between on or about 4 August 2014 and on or about 28 February 2015, [Appellant] committed a lewd act upon [NG], to wit: sexual contact by touching the breasts of [NG] with his hand, with the intent to gratify his sexual desire; and

> (2) That at the time, [NG] was a child who had attained the age of 12 years, but had not attained the age of 16 years.

*See id.* at ¶ 45b.a.(c). The military judge further instructed the members that a "'[l]ewd act' means any sexual contact with a child. 'Sexual contact' means any touching, or causing another person to touch, either directly or through the clothing, any body part of any person, if done with an intent to arouse or

gratify the sexual desire of any person." *See id.* at ¶¶ 45.a.(g)(2)(B), 45b.a.(h)(1), (5).

The Government's case was based primarily on the testimony of NG. She testified that, after the family moved to Germany in August 2014, Appellant touched her breasts with his hand as she lay in bed on multiple occasions, approximately once a month on average. NG was 14 and 15 years old at the time. In addition, NG described the following incident that occurred in February 2015:

> I dated a boy named [J] for about a month, and my parents found out, so I had to break up with him. So, a little bit after that, [Appellant] came in for a normal -- like, to tuck me in and he was talking to me about trust and how I had broken his trust by going behind his back and dating someone. And so he didn't know if he could trust that I hadn't had sex with this boy, so he wanted to make sure that I hadn't. And this is when he put his hand below my underwear and he put his finger -- his fingertip at the entryway, and he was like, "Well, you know, it kind of seems a little big. I don't know. Have you had sex?" And I was like, "No, dad. I haven't." And he was like, "Well, I don't know." It just was like a little argument.

In response to trial counsel's questions, NG clarified that Appellant's finger penetrated her labia. NG did not tell her mother, CG, about this incident, nor to this point had she told her mother about Appellant touching her breasts.

Although CG did not witness these offenses, her trial testimony reinforced NG's testimony in significant ways. Both NG and CG testified to a conversation during a family dinner that occurred in approximately November 2015 regarding one of NG's friends who had developed a cyst or tumor of some type. Appellant commented to NG, "That's why I have to do those exams," or words to that effect. CG, who was previously unaware of any sexual contact between Appellant and NG, later had a conversation with NG and Appellant during which NG revealed Appellant had performed breast exams on her. Appellant claimed it had happened only once, but NG told CG it had happened multiple times. When CG told Appellant he should not examine NG's breasts, Appellant responded to the effect that "somebody had to do it and [CG] didn't." CG also confirmed, *inter alia*, that Appellant used to regularly tuck NG into bed at night and that CG had seen Appellant drink alcohol on occasion.

More significantly, four of NG's friends from Maryland and Germany testified that NG told them Appellant had touched her inappropriately well before such allegations were reported to the AFOSI. As the military judge observed,

this testimony was admitted as substantive evidence without objection or limitation. This evidence powerfully reinforced NG's testimony regarding the sexual assault and abuse by Appellant.

At trial, the Defense contended Appellant never touched NG's breasts or vagina. The Defense suggested NG had fabricated the allegations in part because she had sided with CG against Appellant in the couple's ongoing domestic tensions and eventual legal separation. The Defense further suggested NG was also motivated by spite because Appellant was stricter than CG with respect to NG dating. In particular, in the autumn of 2015 Appellant had taken away NG's cell phone, which was NG's primary means of contacting a boyfriend, AS, who had returned to the United States from Germany. However, these arguments were vitiated by the fact that neither NG nor CG made the initial report to law enforcement, by the testimony of NG's friends that she told them about Appellant's inappropriate touching long before they were contacted by the AFOSI, and by NG's request to each of her friends that they keep her disclosure secret. The Defense was left to advocate the rather strained theory that all of these witnesses were conspiring against Appellant and delivering false testimony at trial.

Appellant testified in his own defense. He denied ever performing breast or vaginal exams on NG for any purpose. He portrayed CG as unhappy in Germany and desirous of returning to the United States. He denied drinking alcohol in Maryland or Germany. He described taking NG's phone away in autumn 2015 because of an inappropriate conversation he heard between NG and her boyfriend in the United States, AS. Appellant confirmed that there had been a dinner conversation in November 2015 about one of NG's friends who had a cancerous cyst removed, but Appellant denied stating that he had performed an exam on NG. However, he further testified there was a follow-up conversation during which NG falsely stated Appellant had touched her. In rebuttal, the Government called two of Appellant's former chaplain supervisors to testify to Appellant's poor character for truthfulness. Moreover, Appellant's bias as a witness is self-evident.

The Defense called Appellant's son, IG, to testify that he never witnessed "anything inappropriate" between NG and Appellant, that he did not recall a dinner conversation about one of NG's friends having cancer, and that as far as he knew Appellant did not drink alcohol. However, IG's testimony was not particularly damaging to the Government's case. NG testified Appellant only touched her breasts and vagina when they were alone in her bedroom; naturally, IG did not witness these events. Appellant himself testified there had been a dinner conversation about NG's friend having cancer; apparently, IG simply did not remember it. As for drinking alcohol, NG and CG did not suggest Appellant drank frequently or openly, and Appellant did not necessarily visit

IG's room after drinking. The Defense also called Lieutenant Colonel (Lt Col) RF, the former wing chaplain at Spangdahlem AB and Appellant's former supervisor. Lt Col RF testified that he accompanied Appellant to visit the family home on the night of 26 February 2016 in order for Appellant to gather clothing and other belongings after receiving the no-contact order. To the extent Lt Col RF's recollection of what he or Appellant said during this brief visit differs from what CG and NG recalled hearing, the differences are of limited materiality and do little to undercut the core evidence against Appellant.

The court members heard the testimony and observed the witnesses testify, including NG and Appellant. The court members were persuaded beyond a reasonable doubt that in Germany Appellant touched NG's breasts on divers occasions and sexually assaulted NG by penetrating her vulva with his hand. So are we. Drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence was legally sufficient to support Appellant's convictions for Specifications 1 and 3 of the Charge beyond a reasonable doubt. *Barner*, 56 M.J. at 134. Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's convictions of the Charge and Specifications 1 and 3 are therefore both legally and factually sufficient.

## B. Post-Trial Delay

Appellant's court-martial concluded on 1 July 2017. However, the convening authority did not take action until 7 December 2017. This 159-day period exceeded by 39 days the 120-day threshold for a presumptively unreasonable post-trial delay that the United States Court of Appeals for the Armed Forces (CAAF) established in *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). Accordingly, we have considered the four factors the CAAF identified in *Moreno* to assess whether Appellant's due process right to timely post-trial and appellate review has been violated: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Id.* at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005), *United States v. Toohey*, 60 M.J. 100, 102 (C.A.A.F. 2004)). "We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *Id.* (citing *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004); *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)).

In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an Appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations

omitted). Where, as in this case, the appellant does not prevail on the substantive grounds of his appeal, there is no oppressive incarceration. *Id.* at 139. Similarly, where Appellant's substantive appeal fails, his ability to present a defense at a rehearing is not impaired. *Id.* at 140. As for anxiety and concern, the CAAF has explained "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* In this case, Appellant argues he was prejudiced because of "the emotional and mental toll suffered by [Appellant] as he patiently awaited the government to perform its prescribed duties." However, Appellant fails to articulate any *particularized* anxiety or concern occasioned by the delay. On the contrary, the generalized "mental toll" Appellant experienced by patiently awaiting convening authority action is the sort of non-particularized anxiety that fails to qualify as prejudice under *Moreno.*

Where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). The Government's processing of Appellant's case is not a model of alacrity. We acknowledge Appellant's trial spanned six days and generated an 805-page transcript; however, it is unclear why convening authority action required an additional 76 days after the military judge authenticated the record on 22 September 2017. Nevertheless, in the absence of cognizable prejudice to Appellant, we do not find the delay so egregious as to adversely affect the perceived fairness and integrity of the military justice system.

Appellant suggests that even if he did not suffer a violation of due process rights under *Moreno*, this court should exercise its authority under Article 66, UCMJ, to grant some unspecified relief as a matter of sentence appropriateness because of the delay. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude that such an exercise of our authority is not appropriate in this case. Among other considerations, we find the delay, albeit facially unreasonable, was not extreme. Although the Government could have acted faster, we find no evidence of "bad faith," "gross indifference," or "institutional neglect;" and the delay has not resulted in palpable prejudice to Appellant or diminished the disciplinary effect of the sentence. *See id.* Accordingly, we find no cause to modify Appellant's sentence because of tardy post-trial processing.

**C. Ineffective Assistance of Counsel**

**1. Law**

The Sixth Amendment[3] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984) (citation omitted). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). Accordingly, we "will not second-guess the strategic or tactical decisions made at trial by defense counsel." *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (quoting *United States v. Anderson*, 55 M.J. 198, 202 (C.A.A.F. 2001)). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *Mazza*, 67 M.J. at 474).

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

> 1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?
>
> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?
>
> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Gooch*, 69 M.J. at 362 (alteration in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

**2. Analysis[4]**

Appellant personally asserts his civilian and military trial defense counsel, Mr. DC and Major (Maj) SW,[5] failed to provide him effective assistance of counsel in several respects. His arguments are supported in part by a declaration

---

[3] U.S. CONST. amend. VI.

[4] The appellate exhibits and briefs pertaining to sections II.C.2.a. and b. of this opinion were sealed pursuant to Rule for Courts-Martial (R.C.M.) 1103A. These portions of the record and briefs remain sealed, and any discussion of sealed material in this opinion is limited to that which is necessary for our analysis. *See* R.C.M. 1103A(b)(4).

[5] Maj SW was a captain at the time of trial.

Appellant submitted to the court. At the Government's request, this court ordered affidavits from Mr. DC and Maj SW. Accordingly, Mr. DC and Maj SW submitted declarations addressing Appellant's claims of ineffective assistance. In general, the trial defense counsel's declarations do not contradict Appellant's assertions of fact but rather explain the strategic and tactical decisions the defense team made at trial. We have considered whether a post-trial evidentiary hearing is required to resolve any factual disputes and are convinced such a hearing is unnecessary. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967). We address Appellant's assertions in turn.

### a. Inconsistent Statements by NG

Appellant contends his trial defense counsel failed to raise a number of inconsistent statements NG allegedly made related to the allegations against him, largely culled from witness statements and evidence summaries included in the AFOSI report of investigation. In particular, Appellant alleges the following discrepancies:

- NG told AFOSI she had "blocked out" memories of multiple occasions on which Appellant had touched her vagina other than the one "virginity check" she recalled in Germany in February 2015, but at trial NG testified to another vaginal touching that occurred in Maryland.

- According to NG's friend HB, NG told HB that Appellant made NG "touch" Appellant, but NG never told AFOSI or testified that she touched Appellant sexually.

- According to HB, NG told HB that after the November 2015 dinner discussion the family met with someone outside the family to discuss Appellant's actions.

- According to HB, NG told HB that NG's mother, CG, "yelled" at Appellant after she learned he had touched NG's breasts.

- NG told AFOSI that she had told yet another friend, KS, that Appellant had touched NG inappropriately, but KS denied NG told her this.

- NG initially told AFOSI that she did not notice Appellant was sexually aroused when he touched her, but later she told AFOSI she could feel that Appellant had an erection.

- NG told yet another friend, TH, that Appellant had forced her to break up with her boyfriend, AS, but according to AS he broke up with NG for another reason.

- According to AS, NG told AS that Appellant had physically hit her, but NG denied such physical abuse to AFOSI.

- According to AS, NG told AS that she had begged Appellant to stop touching her inappropriately, but NG did not describe doing so in her statements to AFOSI or her trial testimony.

We are not persuaded trial defense counsel's failure to exploit these alleged inconsistencies amounted to performance measurably below that expected of fallible lawyers. *See Gooch*, 69 M.J. at 362 (citation omitted). As Mr. DC explained in his declaration, and as manifested in the record of trial, the general defense strategy was

> to deny there was any sexual contact, to call [Appellant] to testify, to focus on NG's credibility where favorable, and to avoid a battle of the experts over grooming techniques and desensitization to sexual touching . . . [which] would have been potentially very unfavorable to [Appellant] had the government chosen to introduce that type of testimony.

Trial defense counsel related this strategy was consistent with the advice of their expert consultant in forensic psychology.

In light of this strategy, it was reasonable for trial defense counsel to avoid delving into peripheral inconsistencies that might draw the court members' attention to additional possible misconduct by Appellant or to references to NG's additional disclosures of Appellant's abuse to other peers and friends prior to February 2016, or that might invite expert testimony from the Government explaining how NG's memory, perception, and reporting might have been affected by Appellant's grooming and desensitizing behavior. These decisions appear particularly rational where the supposed inconsistencies did little to contradict the core allegations against Appellant and in many cases might reasonably be attributed to simple misunderstandings, faulty memories, or differences in perception from among the many witnesses AFOSI interviewed in the course of its investigation. Furthermore, at trial the Defense attempted to exploit other inconsistencies that were more plainly evident and central to the case, such as NG's May 2016 AFOSI interview contradicting her prior February 2016 statements to AFOSI that Appellant had not penetrated her vagina.

On the whole, we find trial defense counsel's decisions with respect to these alleged inconsistencies squarely within the realm of reasonable strategic and tactical decisions that we are not disposed to "second-guess" on appeal. *Mazza*, 67 M.J. at 475 (citation omitted). Even considering the potential cumulative effect of the alleged inconsistencies, we do not find trial defense counsel's performance "measurably below" that expected of defense counsel. *Gooch*, 69 M.J. at 362 (citation omitted). Moreover, we are not persuaded that drawing out these matters at trial would have created a reasonable probability of a more favorable result for Appellant. *See id.*

### b. NG's Alternative Motivations

Appellant contends trial defense counsel "fail[ed] to explore alternate motivations for N.G. to lie about [Appellant]." In particular, he contends NG portrayed Appellant as "super strict, religious, and oppressive," as compared to CG who was more "permissive." In addition, Appellant notes NG had described to her friend, AD, finding a letter from Appellant in which Appellant indicated he desired to return alone to Africa, where Appellant had been born.[6] Finally, Appellant suggests NG not only was bitter about Appellant interfering with her relationship with AS—of which Appellant disapproved—by taking away her phone but may have been motivated to protect AS by accusing Appellant because Appellant believed AS received "nude images of [NG] that may have been considered child pornography."

With respect to NG being biased against Appellant because he was the less permissive parent, that idea was developed at trial to a significant extent. NG testified that Appellant was the "leader" of their "fairly strict household," whereas her mother CG was "a more passive person . . . a little more quiet on issues of discipline and matters like that." CG also testified on cross-examination that Appellant "tended to be more strict [than CG], definitely." NG, CG, and Appellant all testified that it was Appellant who took away NG's phone in the autumn of 2015 which prevented NG from contacting her boyfriend, AS. In addition, the idea that NG preferred CG to Appellant as a parent is closely related to the Defense's contention at trial that neither CG nor NG was a credible witness because they were allied against Appellant in long-simmering tensions between the couple that devolved into a legal separation and the initiation of divorce proceedings by the time of trial.

With respect to Appellant's letter that NG described finding, which was included in the AFOSI report of investigation, contrary to Appellant's assertion it did not state that Appellant did not love NG or that he bore any animosity toward her. It did indicate he was dissatisfied with his relationship with CG (to whom it was addressed, although according to Appellant's testimony never delivered) and was contemplating returning to Africa without the rest of the family. While potentially distressing to NG for various reasons, this undated letter was consistent with other evidence of tensions in the marriage and family. It is unclear how further developing NG's awareness of this letter would have provided an alternative motivation to lie or altered the outcome of the trial.

With respect to the theory that NG was motivated by a desire to protect AS from criminal liability, Maj SW reasonably asserts in his declaration that such

---

[6] Appellant became a naturalized United States citizen in 2001.

evidence would likely have been prohibited by Mil. R. Evid. 412's general prohibition on evidence of a sexual assault victim's other sexual behavior or predisposition. Moreover, there is no indication in the record that AS had been accused of or investigated for any criminal activity, much less threatened with prosecution, thereby weakening this supposed motivation on NG's part. At trial, the Defense did suggest NG was biased against Appellant because he disapproved of and interfered with NG's relationship with AS, a more plausible proposition and one that was better supported by the record.

In summary, we are not persuaded that trial defense counsel failed to develop plausible motivations for NG to fabricate allegations against Appellant such that their performance fell measurably below that expected of defense counsel or that any such failure denied Appellant the reasonable probability of a more favorable outcome. *See id.*

### c. Central Registry Board Results

Appellant asserts trial defense counsel were ineffective in failing "to introduce as evidence the Central Registry Board's determination that N.G.'s allegations against [Appellant] did not meet the criteria for sexual maltreatment." Appellant submitted a memorandum dated 24 August 2016 addressed to himself and his supervisor and informing them, *inter alia*, that the Central Registry Board (CRB) met on that date and determined the allegation of child sexual maltreatment of NG by Appellant "did not meet the criteria for sexual maltreatment and entry into the [Department of Defense] Central Registry database." Mr. DC and Maj SW concede that introducing the CRB determination at trial may have been desirable; however, they were unable to develop any theory of admissibility, and in any event they believed the CRB results were not truly exculpatory.

We do not find trial defense counsel were ineffective by failing to introduce the CRB results. "The CRB makes administrative determinations for suspected domestic abuse and child maltreatment meeting DOD/AF definitions, determinations which require entry into the AF Central Registry database." Air Force Instruction (AFI) 40–301, *Family Advocacy Program*, ¶ 2.2.4.5.1.1. (16 Nov. 2015). The CRB is not a judicial proceeding in any sense; in fact, alleged offenders and any family member involved in the incident or any attorney representing such an individual are specifically prohibited from attending the CRB. *Id.* at ¶¶ 2.2.4.5.1.2.1., 2.2.4.5.1.2.9. Evidence that a majority of a separate administrative body, which did not receive the evidence presented at trial and applied a different standard of proof to answer the limited question of whether the information presented "meets criteria" or "does not meet criteria" for registration, is simply irrelevant to the court-martial proceedings. *See id.* at ¶ 2.2.4.5.1.2.11.1.3.

Even if the CRB members had received exactly the same evidence and instructions as the court members and applied the same standard of proof, their conclusions as to whether NG's allegations were true and the Government had proven Appellant's guilt would still be plainly inadmissible. *See, e.g., United States v. Kasper*, 58 M.J. 314, 315 (C.A.A.F. 2003) (quoting *United States v. Birdsall*, 47 M.J. 404, 410 (C.A.A.F. 1998)) (additional citation omitted) (noting expert and nonexpert conclusions as to the truthfulness of a witness "usurp[ ] the jury's exclusive function to weigh evidence and determine credibility" and are prohibited). Appellant notably fails to propose any theory of admissibility by which the CRB results might properly have been introduced at trial. Accordingly, we conclude Appellant's assertion of ineffective assistance of counsel with respect to the CRB determination is without merit.

## D. Sentence Appropriateness

### 1. Law

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(c), UCMJ, 10 U.S.C. § 866(c) (2016). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (alteration in original) (quoting *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam)). Although we have great discretion to determine whether a sentence is appropriate, we have no authority to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

### 2. Analysis

Appellant personally asserts his sentence is inappropriately severe. He points to his service as a missionary in the years before he joined the Air Force. Appellant also emphasizes the testimony of Dr. JF, a forensic psychologist and the Defense's expert consultant and witness, who advised the court members that Appellant was in the low-risk category for recidivism. Appellant requests that this court approve an unspecified lesser sentence. We are not persuaded to do so.

Appellant was convicted of committing serious sexual offenses against a child. He exploited his position of authority to sexually assault and abuse his adopted daughter in her bed. At trial, NG presented a statement to the court members informing them of the negative impact Appellant's actions have had on her and her family, including the anxiety and mistrust she felt as a result.

Appellant refers to his "selfless service" as an Air Force chaplain, but his argument is undercut by the testimony of a former supervisor who offered the opinion that Appellant's rehabilitation potential was "little to none" and, in particular, the supervisor's experience that Appellant would refuse to acknowledge or accept responsibility for Appellant's errors, including "severe" errors. Certainly, Appellant's assessed low risk for recidivism may weigh in his favor, and the court members likely took it into account when imposing a term of three years in confinement where Appellant faced a maximum term of 50 years.

Having given individualized consideration to Appellant, the nature and seriousness of the offenses, Appellant's record of service, and all other matters contained in the record of trial, we do not find Appellant's sentence inappropriately severe.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c) (2016). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court