# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39697**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Soren G. GERE**
Technical Sergeant (E-6), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 24 November 2020

————————————

*Military Judge:* L. Martin Powell.

*Approved sentence:* Dishonorable discharge, confinement for 10 years, and reduction to E-1. Sentence adjudged 23 January 2019 by GCM convened at Wright-Patterson Air Force Base, Ohio.

*For Appellant:* Major M. Dedra Campbell, USAF; Vik Monder, Esquire.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Jessica L. Delaney, USAF; Mary Ellen Payne, Esquire.

Before MINK, KEY, and ANNEXSTAD, *Appellate Military Judges.*

Judge ANNEXSTAD delivered the opinion of the court, in which Senior Judge MINK and Judge KEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

ANNEXSTAD, Judge:

Contrary to his pleas, Appellant was convicted at a general court-martial composed of a military judge sitting alone of one specification of attempted sex-

ual assault of a child, one specification of sexual abuse of a child, and one specification of sexual assault of a child, in violation of Articles 80 and 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 920b.[1,2] The military judge sentenced Appellant to a dishonorable discharge, confinement for ten years, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

Appellant raises five assignments of error on appeal: (1) whether the military judge erred by denying a defense motion to compel production of a cellular phone belonging to the victim, SN; (2) whether the evidence is legally and factually sufficient to support the convictions; (3) whether the military judge erred by admitting expert testimony at sentencing regarding the long-term effects of child sexual abuse in general; (4) whether Appellant is entitled to new post-trial processing including a new record of trial "where 11 different legal office personnel made major changes to the transcript" and the trial counsel completed both the certification of the transcript and the authentication of the record; and (5) whether Appellant is entitled to new post-trial processing because the staff judge advocate's recommendation (SJAR) and attachments to the SJAR contained multiple errors and failed to properly advise the convening authority. After reviewing the record and considering R.C.M. 1104(a)(2), we find Appellant's fourth assertion does not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). Finding no error materially prejudicial to a substantial right of Appellant, we affirm the findings and sentence.

## I. BACKGROUND

In September 2016, Appellant was a recruiter assigned to the 338th Recruiting Squadron at Wright-Patterson Air Force Base (AFB), Ohio. At that time, SN was a 13-year-old girl who lived with her mother, JR, near Wright-Patterson AFB. SN's mother and father were separated, and her father lived

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial (R.C.M), and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] The specification of attempted sexual assault of a child was a lesser included offense of Specification 3, that alleged sexual assault of a child of which the military judge found Appellant not guilty. The military judge also conditionally dismissed Specification 1, sexual abuse, on the condition that the Specification 2, sexual assault of a child, and Specification 3, attempted sexual assault of child, were affirmed on appeal. The military judge also merged Specifications 2 and 3 at sentencing, resulting in a maximum term of confinement of 30 years.

in California. Appellant had been dating JR for about a year and SN would normally interact with Appellant multiple times per week.

On the weekend of 10 September 2016, SN and her mother went to Appellant's house near Beavercreek, Ohio. At his house, Appellant provided SN with multiple alcoholic drinks. Over the course of the evening, SN consumed both beer and mixed drinks. SN testified that she does not recall exactly how many alcoholic drinks she consumed that evening, but knew it was more than two, and she felt tipsy and drunk. Throughout the night, SN took videos of herself on her cellular phone in an intoxicated state, 38 of which were admitted into evidence at trial. At some point, SN recalled that Appellant walked her over to his bed and gave her a small pill. Appellant told SN the pill would help her sleep. SN understood that Appellant and her mother were going out to a local bar. After Appellant and JR left, SN fell asleep in Appellant's bed.

The next thing SN recalled was waking up when Appellant and her mother returned from the bar. SN testified that she "was drunk and . . . really couldn't get up or really move." She stated that Appellant laid down next to her in the bed and that her mother was laying on the other side of Appellant, not immediately next to her. SN testified that Appellant placed his hand up her shirt and under her binder[3] before touching "both" of her breasts. She further testified that Appellant pulled her underwear down and "put his fingers inside of [her]." As this was happening, Appellant told SN "not to tell anyone." SN testified that she tried to mumble "stop" under her breath, but the words would not come out because she was in "shock." SN testified that while Appellant touched her he was kissing her neck and mouth. SN testified that Appellant smelled like alcohol and cigarettes and that she felt "repulsed" while this was happening. SN testified that while laying on her side, with her back to Appellant, she felt Appellant's erect penis against her buttocks. SN then stated that she felt his penis around her vagina and that while this was happening Appellant was "breathing" on her and "thrusting" and "jerking" his body. SN testified that she felt his penis touching her vagina, but it did not go inside her vagina. SN testified that she tried to get up but that Appellant held her down by placing his hand on her stomach region.

SN was finally able to get away and went to the kitchen near the living room. Appellant followed her to the kitchen and slightly shoved her, while asking her what was wrong. SN did not respond, and went to the living room to

---

[3] At trial, SN testified that a "binder" is a piece of clothing used by individuals to "bind" their breasts down. SN stated that her binder was made of cotton and had multiple hooks on the back to keep it closed.

sleep on the couch, while Appellant returned to his bedroom. SN testified that she could not sleep and spent most of the night crying.

The following morning, Appellant drove SN and her mother home. SN testified that she did not immediately tell her mother what happened because she thought her mother "wouldn't believe [her]." Later that day, SN told her friend, EH, that her "mom's boyfriend raped" her. That same night, SN had a conversation with another friend, JE, and was in tears as she told JE that she had been drinking with her mom and her boyfriend, and that her mom's boyfriend came in the room, got on top of her, and raped her. Both of her friends encouraged her to report the incident, but SN refused because she was worried her mother would get in trouble for allowing her to drink alcohol.

The following Monday at school, SN testified that she told several other friends about the assault. All of SN's friends encouraged her to report the assault; however, SN chose not to. After school, one of SN's friends, JE, told her mother, who immediately reported the assault to Child Protective Services. Subsequently, a social worker and civilian law enforcement officer were dispatched to SN's house. JR initially met with police and asked for a lawyer, and also asked to speak to SN in private. During their private conversation, JR told SN not to tell the police about the alcohol.

After speaking with police about what had happened, SN agreed to go to the hospital, where she underwent a sexual assault forensic examination (SAFE). As part of the examination, deoxyribonucleic acid (DNA), fingernail scrapings, and a head hair sample were collected, and buccal swabs were taken from SN. While at the hospital, SN also provided a urine sample.

At trial, the Government called TA, a forensic scientist from the Ohio Bureau of Criminal Investigation. The court recognized TA as an expert in the field of forensic DNA analysis. TA testified that he examined the SAFE kit from SN, which included oral and vaginal samples, fingernail scrapings, a head hair sample, and skin swabs from the pubic area. TA further testified that "a low amount of male DNA" was found on the pubic area samples taken from SN, but due to the small amount of DNA present, a DNA profile could not be produced.

During trial, the Government also called HA, a toxicologist from the Coroner's Office Crime Lab in Troy, Ohio. The court recognized HA as an expert in the field of toxicology. HA testified that SN's urine sample showed traces of ibuprofen and diphenhydramine and that diphenhydramine is the active ingredient found in over-the-counter sleep aid medication. HA testified that subsequent confirmation tests did not detect diphenhydramine above the cut-off level of six nanograms per milliliter in SN's urine sample.

4

## II. DISCUSSION

### A. Production of SN's Cellular Phone

Appellant alleges that the military judge abused his discretion by not compelling production of SN's cellular phone. Specifically, Appellant alleges the military judge's findings of fact were not supported by the evidence and that incorrect legal principles were applied. We disagree.

#### 1. Additional Background

On 15 January 2019, Appellant's trial defense counsel made an oral motion to compel the production of SN's cellular phone for forensic analysis. Appellant contends that the cellular phone, which was in SN's possession, contained evidence that SN either recanted the allegations or admitted to lying about the allegations in written communications with JR. The Government opposed the motion. The court received evidence and heard argument on the motion on 15 and 16 January 2019. Specifically, the court received live testimony from SN, JR, and a Mr. JR, a senior digital forensic examiner.

SN testified that from November 2016 until the date of the court-martial, she lived with her father in California. During that time she communicated with her mother, in Ohio, through text messaging on Snapchat and Facebook. At some point, SN "blocked" her mother on Snapchat. This had the effect of temporarily making conversations between the two disappear from view on the messaging application. On 15 January 2019, SN was asked by trial counsel to "unblock" her mother. This had the effect of making the Snapchat conversations visible again. SN then testified that she went through the conversations she had with her mother and began taking screenshots of them. SN testified that while she was taking screenshots of the messages she accidently deleted one from 6 September 2017. SN stated that the deleted message was one she sent to JR that stated something along the lines of "I f' d up." The message immediately preceding the deleted message was a message from SN which said, "Hi mom I'm on my iPad my dad took away my phone." The message immediately following the deleted message is a message from JR to SN that asks "[What] did you do? . . . I promise I won't get mad you can tell me." SN testified that when she sent the deleted message she was talking to JR about getting in trouble with her father and was not referring to the allegations or the court-martial.

SN further testified that she had conversations with JR about the court-martial via Snapchat. SN testified that JR would encourage her "not to go through" with the court-martial. SN testified that she knew there were messages missing from the conversations with JR, but she did not remember what they said. However, SN testified that she never told JR that she made up the

allegations. She further testified that on multiple occasions JR encouraged her to change her statement and not go through with the court-martial.

JR testified that shortly after 11 September 2016 SN was removed from her custody and sent to live with her grandmother. JR testified that SN lived with her grandmother until November 2016, at which time she moved to California with her father. JR testified that she would communicate with SN via Snapchat, Facebook, and telephone calls. JR stated that on 15 January 2019, she was asked by trial defense counsel to take screenshots of all of the saved Snapchat messages between herself and SN and that while she was taking screenshots she received a notice indicating that SN had just "deleted" a message from 6 January 2017. JR stated that she viewed the message before it was deleted and it said "Mom, I'm sorry. I f**ked up." JR agreed with SN that some messages were missing from their Snapchat conversations, but she didn't know the content of any of the other messages that might have been missing.

Contrary to SN's testimony that she never told JR she had made up the allegations, JR testified that SN recanted the allegations or admitted to lying about the allegations against Appellant on three occasions. One of those occasions occurred on or about 6 September 2017 as part of the conversation involving the deleted message. The second occasion occurred on or about 27 September 2018, where JR stated that SN verbally told her during a telephone conversation that she was lying about the allegation and did not want to go through with the prosecution of the case, and, in response, JR sent a Snapchat message with the name and telephone number for Appellant's trial defense counsel. JR testified that the third occasion occurred on the telephone, not through any text message application. Finally, in response to questions from the military judge, JR testified that all of the conversations in which SN admitted to her that she made up the allegations occurred telephonically, voice to voice, and that none were sent in message format over Snapchat.

Mr. JR, an expert in computer forensics, also testified on the motion. Mr. JR testified that Snapchat is an application that allows individuals to send text messages as well as images and videos. He stated Snapchat has a default setting which deletes multimedia or text messages; however, he indicated the default setting may be modified by the user. Mr. JR also testified that messages may be saved within the application by "screenshotting" them, or saved through third-party applications, and that deleted Snapchat messages can be retrieved in a manner similar to deleted text messages, through extraction of the cellular phone. Extraction of the cellular phone involves accessing the database that houses the text messages as well as any attachment folders, copying all the data, then analyzing that data for evidence related to the Snapchat messages. Mr. JR stated that the likelihood of recovering deleted messages is based on several factors: the amount of time that has passed since the deletion

occurred, how often the phone was used during this period, and whether or not the user saved the chat at the time it was sent. Finally, Mr. JR testified that, considering the memory limitations of mobile devices, there was not a good chance of recovering deleted Snapchat messages more than one to two months old from the device of an active user like SN, but the likelihood of recovery would increase for newly deleted Snapchat messages.

On 16 January 2019, the military judge denied the motion to compel the production of SN's cellular phone for examination. The military judge found that SN's cellular phone was not in the possession of the Government, and therefore, discovery under Rule for Courts-Martial (R.C.M.) 701 was not applicable. Turning to production under R.C.M. 703, the military judge found that the defense failed to establish "by a preponderance of the evidence that the production of SN's cellular phone for analysis would lead to any relevant or necessary evidence beyond evidence already available to the defense in the form of saved messages and the testimony of [JR] and SN."

In support of his finding, the military judge discussed the testimony of JR, who specifically stated that all conversations where SN had recanted the allegations against Appellant had occurred on the telephone and not via text messages. The military judge stated in his ruling that taking JR's testimony at face value, she provided "no significant evidence to suggest that there would likely be any 'smoking gun' type recantation messages contained on SN's cellular phone."

Regarding the ability to obtain deleted messages through extraction of the cellular phone, the military judge found that recovery of automatically deleted messages was complicated by the passage of time and the amount of use by the user of the application. He further found SN to be an active user, having used the application over 50,000 times. He concluded there was not a good chance of recovering a deleted Snapchat message that was sent by an active user in September 2018 and that the further back in time those messages were sent the less likely it was that those messages could be recovered through extraction. Additionally, the military judge found that the metadata related to phone calls and text messages might be discovered by extraction of the cellular phone, but such data would only reveal information such as the time and date of the messages, and not the actual substance of the messages.

### 2. Law

We review a military judge's ruling on requests for discovery or production of evidence for an abuse of discretion. *United States v. Jones*, 69 M.J. 294, 298 (C.A.A.F. 2011) (citing *United States v. Morris*, 52 M.J. 193, 198 (C.A.A.F. 2008)). An abuse of discretion occurs when the military judge's findings of fact are clearly erroneous or when his ruling is influenced by an erroneous view of

the law. *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008). An abuse of discretion involves much more than a difference of opinion. *See United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987) (citation omitted). In order to be reversed on appeal, the challenged action must be "arbitrary, fanciful, clearly unreasonable," or "clearly erroneous." *See id.* at 62–63 (citation omitted).

The Due Process Clause of the Fifth Amendment[4] guarantees criminal defendants be afforded a meaningful opportunity to present a complete defense. *United States v. Webb*, 66 M.J. 89, 92 (C.A.A.F. 2008) (citations omitted). Each party to a court-martial must have an equal opportunity to inspect evidence and to obtain witnesses and other evidence. *United States v. Stellato*, 74 M.J. 473, 483 (C.A.A.F. 2015) (citing R.C.M. 701(e); Article 46, UCMJ, 10 U.S.C. § 846).

Each party is entitled to the production of evidence which is relevant and necessary. R.C.M. 703(f)(1); *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004) (citation omitted). Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the action." Mil. R. Evid. 401. "Relevant evidence is 'necessary when it is not cumulative and when it would contribute to a party's presentation of the case in some positive way on at matter in issue.'" *Rodriguez*, 60 M.J. at 246 (quoting R.C.M. 703(f)(1)).

As a threshold matter, in order to be entitled to production of evidence, the defense must first demonstrate that the requested material exists. *Id.* The defense request for production of evidence must list the items of evidence to be produced and include a "description of each item sufficient to show its relevance." R.C.M. 703(f)(3). The burden of proof for factual issues related to this motion is a preponderance of the evidence. R.C.M. 905(c)(1). The burden of persuasion is on the moving party. R.C.M. 905(c)(2); R.C.M. 906(b)(7).

### 3. Analysis

Appellant alleges that the military judge abused his discretion in two ways. First, Appellant asserts the military judge made an erroneous finding of fact concerning the likelihood of recovering deleted messages from SN's phone; and second, that the military judge applied incorrect legal principles by requiring the evidence to be a "smoking gun" of recantation. We disagree and find the military judge's findings of fact were supported by the evidence and that correct legal principles were applied.

---

[4] U.S. CONST. amend. V.

Appellant specifically sought extraction of SN's cell phone to recover deleted Snapchat conversations where SN had purportedly recanted her allegations against Appellant. Appellant contends that the military judge was clearly erroneous in his findings of fact regarding the likelihood of recovering deleted messages from SN's cellular phone. We agree with the military judge's conclusion that Appellant's motion to compel the cellular phone fails, because the Defense never established the sought-after Snapchat messages existed on the phone, a prerequisite for the production request. In his written ruling, dated 16 January 2019, the military judge found that Appellant had failed to establish by a preponderance of the evidence that any relevant evidence existed in the deleted text messages. The military judge's findings are supported by the testimony of SN, who denied recanting the allegations and unequivocally stated that she never sent Snapchat messages to that effect. Although JR disputed SN's claims about never recanting, JR agreed that SN never recanted her allegations via text message and testified that SN's recantations occurred exclusively during "voice to voice" telephone calls. Trial defense counsel offered no specific information that any other relevant evidence not already in the possession of the Defense was on the phone. We agree with the military judge that Appellant failed to establish that forensic analysis of the cellular phone in question would have revealed additional relevant or helpful evidence related to the deleted conversation beyond the evidence that was already available to the Defense.

Appellant next contends that the military judge erred when he required the evidence to be a "smoking gun," which is not the standard required by law. Appellant's contention is without merit. While the military judge did refer to a "smoking gun" in his ruling, it is evident from the entirety of the ruling that this was a colloquialism, and he required nothing more than a showing that the evidence was relevant and necessary. Nowhere in the ruling did the military judge discuss the legal standard as "smoking gun." In fact, in his conclusion the military judge demonstrated that he applied the correct legal principles when he wrote that Appellant failed to establish "by a preponderance of the evidence that the production of SN's cellular phone for analysis would lead to any relevant or necessary evidence . . . ." We conclude the military judge applied the correct legal principles and did not abuse his discretion in denying the defense motion to compel the production of SN's cellular phone for forensic extraction.

**B. Legal and Factual Sufficiency**

Appellant contends that his convictions are both legally and factually insufficient. Appellant's sole argument focuses on the claim that SN was not a sufficiently credible witness. Appellant presents three bases under which he argues we should discount SN's testimony: first, that SN's testimony regarding

the accidental deletion of the Snapchat message was evidence that she lied and made her testimony unreliable; second, that her multiple inconsistent statements demonstrate a lack of memory and cast doubt on her testimony; and third, that SN had a motive to lie which creates reasonable doubt. We disagree.

**1. Law**

A Court of Criminal Appeals may affirm only such findings of guilty "as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c). "Article 66(c) requires the Courts of Criminal Appeals to conduct a de novo review of legal and factual sufficiency of the case." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (emphasis and citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inference from basic facts to ultimate facts." *Unites States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," this court is "convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). The term "reasonable doubt" does not mean evidence free from conflict. *Lips*, 22 M.J. at

10

684 (citation omitted). This court's review of the factual sufficiency of evidence for findings is limited to the evidence admitted at trial. Article 66(c), UCMJ; *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007) (citations omitted).

Appellant was convicted of sexual abuse of a child in violation of Article 120b(c), UCMJ, 10 U.S.C. § 920b(c), which required the Government to prove two elements beyond a reasonable doubt: (1) Appellant committed a sexual act upon SN by touching her breast; and (2) Appellant did so with the intent to gratify his sexual desire. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45b.b.(4)(a). For this specification, the Government had to additionally prove SN was under the age of 16 years. *See MCM*, pt. IV, ¶ 45b.a.(h)(4).

Appellant was also convicted of sexual assault of a child in violation of Article 120b(b), UCMJ, 10 U.S.C. § 920b(b), which required the Government to prove three elements beyond a reasonable doubt: (1) Appellant committed a sexual act upon SN by causing penetration, however slight, of her vulva with his fingers; (2) at the time of the sexual act SN had attained the age of 12 years, but not 16 years; and (3) Appellant did so with the intent to gratify his sexual desire. *See MCM,* pt. IV, ¶ 45b.b.(3)(b).

Appellant was also convicted of attempted sexual assault of a child in violation of Article 80, UCMJ, 10 U.S.C. § 880, which required the Government to prove four elements beyond a reasonable doubt: (1) Appellant did a certain overt act; (2) the act was done with the specific intent to commit sexual assault of a child by causing penetration, however slight, of SN's vulva with his penis while she had attained the age of 12 years but was under the age of 16 years; (3) the act amounted to more than mere preparation; and (4) the act apparently tended to effect commission of sexual assault of a child. *See MCM,* pt. IV, ¶ 4.f.(b).

### 2. Analysis

Appellant's first contention is that SN lied to the military judge when she testified that she "accidently" deleted the "f**ked up" Snapchat message while trying to screenshot the messages she exchanged with JR. Specifically, Appellant alleges that the message was deleted at some point on 15 January 2019 before SN started to take screenshots and that SN was untruthful concerning how or in what order the message was deleted. Appellant contends that this "lie" demonstrates that SN intentionally tried to erase evidence showing that she recanted her allegations to JR, thus making her testimony unreliable.

We find Appellant's argument unpersuasive. While it may be unclear as to the exact time the message was deleted on 15 January 2019, there is no reason to believe that the deletion was anything other than an accident. There is also

no reason to believe that SN deleted the message in an effort to mislead or hide evidence. Both SN and JR agreed, while testifying in court, to the content of the deleted message, so there would be no obvious reason for SN to intentionally delete the message if she was going to freely admit what it said.[5] This directly cuts against Appellant's argument.

Moreover, there is no evidence that any text messages in which SN recanted the allegations ever existed. To the contrary, JR testified that all statements where SN purportedly recanted her allegations against Appellant were made over the telephone and not by text message. Finally, SN testified that the deleted message referred to an incident where she got in trouble with her father, which is consistent with the text messages both immediately before and after the deleted text. Even if SN was untruthful about how the deletion occurred, it is a minor inconsistency, in light of SN's consistent statements and corroborating evidence, we are not persuaded that SN's testimony was unreliable.

Appellant next highlights multiple inconsistent statements made by SN to her friends, family, and others involved. Appellant argues that these inconsistencies demonstrate a lack of memory and cast doubt on her testimony. While we find it unnecessary to specifically cover every possible inconsistent statement in detail, we note that the majority of these statements were born from statements made to other 13-year-olds, two years before they testified at trial. Appellant argues that SN generally described a violent rape to her friends, in which Appellant held her down, and was on top of her, and that these prior descriptions were inconsistent with her testimony at trial. Additionally, Appellant contends SN gave different statements regarding her use of alcohol to various witnesses including law enforcement, Child Protective Services, and the sexual assault nurse examiner.

While witness testimony at trial contained some inconsistencies, this is to be expected as a result of the passage of time between the incident in September 2016 and the trial in January 2019. It is also expected considering the age of many of the witnesses. We also note that there are simple misunderstandings that result in inconsistencies among many witnesses as a result of the witnesses memory and perceptions of the events. These inconsistencies do not necessarily make witness testimony less credible. We have considered the discrepancies noted by Appellant, along with the motives advanced by Appellant. Testimony "need not be completely consistent to still be sufficiently reliable to

---

[5] We also note that trial defense counsel, who also viewed the deleted message before it was deleted, proffered to the court during the motion hearing that the content of the message was the same as described by SN and JR.

sustain a conviction, and we do not confine our analysis to merely the testimony of a single witness in performing our factual sufficiency review under Article 66, UCMJ." *United States v.* McFadden, No. ACM 38597, 2015 CCA LEXIS520, at *11 (A.F. Ct. Crim. App. 18 Nov. 2015) (unpub. op.); *see also United States v.* McElhaney, 50 M.J. 819, 832 (A.F. Ct. Crim. App. 1999)(concluding evidence factually sufficient, in part because appellant's wife corroborated his romantic relationship with the victim notwithstanding the appellant's claim that the victim's testimony was implausible and inconsistent). Additionally, witness testimony that is inconsistent does not necessarily suggest that SN herself was inconsistent. In fact, the documentary and video evidence that SN took of herself earlier in the night of the assault generally showed that SN's testimony was consistent with her initial reports.

Finally, Appellant contends that SN had a motive to lie and made up the allegations so that she could permanently move in with her father. Appellant contends that SN and her mother argued frequently and that SN felt her father was generally more supportive. There is no reason to believe SN had a motive to lie. To the contrary, the evidence presented at trial demonstrates that SN and JR continued to communicate, from the incident until trial and that they had frequent conversations on the phone and via text message. Additionally, the evidence showed that SN did not inform authorities about her use of alcohol in order to protect her mother, which cuts directly against this contention.

We find that SN's testimony was sufficient to establish proof of each element of each offense beyond a reasonable doubt. SN testified that Appellant digitally penetrated her vagina with his fingers, and that his hand touched her breasts under her binder. She further testified that Appellant's penis was hard against her back. Unlike her unequivocal testimony about Appellant touching her breasts and digitally penetrating her, SN was somewhat unclear about whether actual penetration of her vagina by his penis occurred. However, she did testify that she felt it touch her vagina, which supports the military judge's verdict in which he found Appellant not guilty of the ultimate offense but guilty of the lesser included offense of attempt.

SN's testimony was corroborated by her immediate outcry statements to her friends and her consistent recitation of the events to Child Protective Services personnel, the sexual assault nurse examiner, and law enforcement interviewers. Furthermore, while not conclusive, the results of the initial toxicology test supported her statements that she was given a small pill, on the night of the assault. Similarly, the DNA report demonstrated some male DNA present on her pubic area, which a rational factfinder could conclude corroborates her statements. The videos of SN on the night of the assault also corroborated her statement that Appellant had given her alcohol and that she was intoxicated.

Finally, in assessing SN's credibility, we note the testimony regarding SN's consistent demeanor throughout these multiple reports. SN was described by her friend EH as "withdrawn." Another friend, JE, stated that SN was "on the edge of tears." SN's friends at school described her as being "sad." Law enforcement and the sexual assault nurse examiner noted that she had been crying and became tearful while discussing the assault. Such consistency supports SN's credibility and undermines the suggestion she fabricated her allegation of the assault.

In assessing legal sufficiency, we consider the evidence produced at trial in the light most favorable to the Government. In doing so, we conclude a rational factfinder could have found beyond a reasonable doubt all the elements to support Appellant's convictions for sexual assault of a child, sexual abuse of a child, and attempted sexual assault of a child. Furthermore, in assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's convictions both legally and factually sufficient.

## C. Expert Testimony Regarding the Effects of Child Sexual Abuse

### 1. Additional Background

In sentencing, the Government called Dr. NS, who had extensive experience diagnosing and treating child victims of sexual assault. The military judge recognized Dr. NS as an expert in the field of forensic psychology with a specialty in child sexual abuse. Appellant did not object to the military judge recognizing Dr. NS as an expert in that capacity and did not object at any point during her testimony.

Dr. NS testified in general regarding the long- and short-term impacts of sexual abuse on children. Dr. NS further testified that there is no way to predict how a particular victim is going to move forward after being sexually abused. Appellant now contends that Dr. NS's testimony was not directly related to Appellant's offenses, and that by failing to connect common long-term effects of child sexual abuse to the present or prospective impacts on SN, her testimony was irrelevant. We disagree.

### 2. Law

We review a military judge's admission of evidence for an abuse of discretion. *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993). Where there is no objection at trial, the admission of expert testimony is reviewed for plain error. *United States v. Green*, 55 M.J. 76, 81 (C.A.A.F. 2001) (citations omitted). In reviewing for plain error, the burden is on Appellant to show: (1) there was

an error; (2) the error was plain and obvious; and (3) the error materially prejudiced a substantial right. *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011) (footnote and citation omitted).

Military courts-martial have also regularly permitted qualified experts to provide testimony that child victims of sexual abuse are "at a higher risk" of suffering long-term effects of the abuse. *United States v. Hammer*, 60 M.J. 810, 829 (A.F. Ct. Crim. App. 2004) (citations omitted); *see also United States v. Stark*, 30 M.J. 328, 329–30 (C.M.A. 1990); *United States v. Hammond*, 17 M.J. 218, 219 (C.M.A. 1984); *United States v. Marchand*, 56 M.J. 630, 633 (C.G. Ct. Crim. App. 2001).

R.C.M. 1001(b)(4) permits evidence in aggravation "directly relating to or resulting from the offenses of which the accused has been found guilty." Expert testimony is permissible if the expert's "specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue." Mil. R. Evid. 702.

### 3. Analysis

It is well-settled law that this type of evidence is permissible during sentencing. Dr. NS's testimony was directly related to the effects of sexual abuse on children, and she discussed the psychological and emotional components when the assault was committed by someone the victim knew as opposed to a stranger. Additionally, Dr. NS testified regarding the impact that sexual assault has on a child's ability to have relationships and also how it affects the victim's self-esteem. In this case, the crimes against SN were committed by someone she knew, and the evidence at trial clearly established that the crimes impacted SN's relationship with her mother and others. Furthermore, Dr. NS's testimony concerning the inability to predict what long-term effects, if any, a child victim of sexual assault might experience was appropriately cabined. We find a sufficient nexus between this evidence and the evidence of Appellant's crimes, and find the military judge did not err in allowing this testimony at sentencing.

### D. Post-Trial Processing

### 1. Additional Background

The SJAR, dated 8 May 2019, incorrectly listed the maximum term of confinement as 70 years. The correct maximum term of confinement was 30 years.

The Personal Data Sheet (PDS) that was attached to the SJAR also contained three errors. First, it listed the wrong basic pay. Second, it failed to list Appellant's prior service in the United States Marine Corps (USMC). Third, it omitted one device on Appellant's Air Force Good Conduct Medal (AFGCM).

While it is apparent that this information was corrected during trial and admitted by the Government without objection, it is also apparent that a different version of Appellant's PDS with the errors noted above was attached to the SJAR.

On 18 May 2019, Appellant submitted his clemency matters to the convening authority. In his matters, Appellant's counsel stated that the evidence presented at trial was insufficient to support any finding of guilt against Appellant. Additionally, Appellant's counsel complained about the manner in which the transcript and the record of trial were completed. Appellant did not object to any of the errors in the SJAR, and the errors were neither corrected nor mentioned in the addendum to the SJAR signed on 20 May 2019.

The addendum to the SJAR stated "[t]he defense alleges one legal error: The defense counsel argues that she was not given a reasonable opportunity to review the transcript or review the audio recordings from trial. I considered carefully the allegation of error, and find it to be without merit." The addendum to the SJAR further stated, "My earlier recommendation remains unchanged. I recommend you approve the findings as adjudged. I recommend that you approve the findings and sentence as adjudged." The addendum to the SJAR did not state or address Appellant's challenge to the legal and factual sufficiency to the offenses. However, the staff judge advocate did advise the convening authority in the SJAR that he was "satisfied that the evidence upon which the conviction is based is legally sufficient."

**2. Law**

Proper completion of post-trial processing is a question of law this court reviews de novo. *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000); *United States v. Sheffield*, 60 M.J. 591, 593 (A.F. Ct. Crim. App. 2004) (citation omitted).

The SJAR "plays a vital role in providing the convening authority with complete and accurate advice in the exercise of command discretion." *United States v. Scalo*, 60 M.J. 435, 436 (C.A.A.F. 2005) (citation omitted). As our superior court has noted, Appellant's greatest chance for post-trial clemency comes from the convening authority. *See United States v. Wheelus*, 49 M.J. 283, 287 (C.A.A.F. 1998) (citations omitted). "The better the convening authority is informed the more fairly and justly he will exercise his discretion." *United States v. Boatner*, 43 C.M.R. 216, 218 (C.M.A. 1971) (citation omitted). R.C.M. 1106(d) requires the SJAR to comment on any allegation of legal error raised in clemency, and must state, at a minimum, a statement of agreement or disagreement with the matters raised by the accused. R.C.M. 1106(d)(4)). "The role of the convening authority with respect to defense claims of legal error is less

16

pivotal to an accused's ultimate interests [than the convening authority's role in clemency]." *United States v. Hamilton*, 47 M.J. 32, 35 (C.A.A.F. 1997).

Before taking action on a sentence, the convening authority must consider the SJAR. R.C.M. 1107(b)(3)(A)(ii). The SJAR in an Air Force case should contain a copy of the PDS admitted at trial. Air Force Instruction (AFI) 51-201, *Administration of Military Justice*, ¶ A11.15 (18 Jan. 2019).[6] An error in the SJAR "does not result in an automatic return by the appellate court of the case to the convening authority." *United States v. Green*, 44 M.J. 93, 95 (C.A.A.F. 1996). "Instead, an appellate court may determine if the accused has been prejudiced by testing whether the alleged error . . . would have led to a favorable recommendation by the SJA or corrective action by the convening authority." *Id.* (citations omitted).

Failure to timely comment on incorrect matters in the SJAR, or attached to the SJAR, waives any later claim of error absent plain error. *Scalo*, 60 M.J. at 436 (citations omitted). To prevail on a plain error analysis, Appellant has the burden of demonstrating: (1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right. *See id.* (citations omitted). In the context of post-trial processing, Appellant must make at least some "colorable showing of possible prejudice" demonstrating how the alleged error potentially affected the opportunity for clemency. *Id.* at 437 (citation omitted). The low threshold is designed to prevent undue speculation as to how an error may have affected "the convening authority's exercise of such broad discretion." *Id.* (citation omitted).

### 3. Analysis

Appellant asserts that he is entitled to new post-trial processing because the addendum to the SJAR failed to address Appellant's claim of legal error regarding the legal and factual sufficiency of the offenses of which Appellant was convicted, and because the SJAR incorrectly listed the maximum term of confinement. Appellant also claims he is entitled to relief because the PDS that was attached to the SJAR contained multiple errors. We are not persuaded that Appellant is entitled to relief.

As to Appellant's claim that the addendum to the SJAR failed to address Appellant's claims that the evidence was legally and factually insufficient, we find this to be plain and obvious error, but do not find prejudice. "The failure to address a defense claim of legal error in an addendum to an SJAR can be remedied through appellate litigation of the claimed error." *Matos*, unpub. op. at *13. Appellant raised this same alleged error in his appeal to this court, and

---

[6] This is the version of AFI 51-201 in effect on the date the SJAR indicates it was prepared—8 May 2019.

we have resolved it adversely to Appellant. As discussed above, there was no merit to Appellant's claim of legal error relative to the legal and factual sufficiency of the evidence, and therefore Appellant cannot make a showing of possible prejudice. Furthermore, the convening authority had no authority to disapprove a finding of guilty even if the convening authority had been convinced there was error. Article 60, UCMJ, 10 U.S.C. § 860.

As to Appellant's claim that the wrong maximum term of confinement was listed in the SJAR, we find this too was plain and obvious error. However, Appellant has failed to demonstrate a colorable showing of possible prejudice. Under Article 60, UCMJ, the convening authority, in this case, did not have the ability to commute or set aside the sentence to confinement or the punitive discharge. Appellant in this case was convicted and sentenced by a military judge and the sentence adjudged was one-third of the maximum punishment available with respect to Appellant's sentence to confinement. Given the limited options available to the convening authority, Appellant has failed to demonstrate that if the convening authority was advised of a lesser term of maximum confinement, the convening authority would have taken some action favorable to Appellant. Therefore, we find Appellant has failed to demonstrate possible prejudice.

While we also find the errors or omissions in the PDS that was attached to the SJAR to be plain and obvious errors, Appellant has not attempted to show, nor do we find, that he would have received either a favorable recommendation by the staff judge advocate or favorable action by the convening authority without the error. Additionally, the convening authority was provided with significant data concerning Appellant's meritorious military service, including all of his enlisted performance reports. Moreover, Appellant included in the clemency submission to the convening authority photos depicting his service in the USMC, a submission which the convening authority affirmed he reviewed before taking action. Appellant cannot claim prejudice where the evidence was before the convening authority. *See United States v. Lucero*, No. ACM 38386, 2014 CCA LEXIS 743 (A.F. Ct. Crim. App. 1 Oct. 2014) (unpub. op.) (finding no prejudice where there was nothing preventing the appellant from raising matters to the convening authority). Appellant, in this case, was convicted of sexually assaulting a 13-year-old girl, and we find it inconceivable that the convening authority would have granted relief had the PDS attached to the SJAR shown Appellant's correct pay amount, his prior service as a Marine, or that he had an additional device on his AFGCM. Therefore, we conclude that Appellant has not met the threshold of establishing a colorable showing of possible prejudice, and is not entitled to relief.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.[7]

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

---

[7] Although not raised by the parties, we note two errors in the court-martial order (CMO). First, the charged article is incorrectly identified as Article "120" rather than "120b." Second, the third specification is incorrectly identified as "specification" rather than "Specification 3." We direct the publication of a corrected CMO to remedy these errors.